**ATLANTA & ST. A. B. RY. CO. v.
BARNES et al.\***
No. 8508.

Circuit Court of Appeals, Fifth Circuit.
March 15, 1938.

\*Rehearing denied 96 F.2d 18.

274

Arthur G. Powell, of Atlanta, Ga., and Howard S. Bailey, of Chipley, Fla., for appellant.

William Fisher, of Pensacola, Fla., and J. M. Sapp and Joseph W. Bailey, both of Panama City, Fla., for appellees.

Before FOSTER, SIBLEY, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

From January, 1930, to about May 31, 1933, George A. Barnes was station agent at Lynn Haven, which is about two miles from Panama City, Florida, the southern terminus of the Atlanta & Saint Andrews Bay Railway. During this period Barnes' accounts were never audited, but on the latter date he was checked short over $25,-000 and was discharged. Lynn Haven, because of spur tracks which served a large paper mill of the Southern Kraft Corporation, and the lumber mills of the Saint Andrews Bay Lumber Company, and the wharves of Waterman Steamship Company, was the most important station on the railroad. Barnes collected more than a million dollars during his last two and a half years as agent. He was authorized to collect only cash except from the three above named customers, who were extended brief credit and paid Barnes periodically by checks payable to the Atlanta & Saint Andrews Bay Railway Company. The Railway Company had as its authorized depository the First National Bank of Panama City until the bank's failure in January, 1931. The First National Bank of Dothan, Alabama, then became the depository, and Barnes and other agents were furnished a rubber stamp to indorse these checks expressly "for deposit only." Cash collections were remitted to Dothan by express. The agents, being bonded, often accepted checks instead of cash from other customers, but at their own risk, those checks being sometimes made payable to them personally, sometimes to them as agent, sometimes to the Railway Company. The agents used their judgment as to whose checks they would receive. Agents were permitted to use the Company's cash to take up the Company's pay-roll checks to others, and could buy postage stamps. They had no express authority to indorse the Company's name otherwise than by the rubber stamp mentioned, but often did indorse and collect at Panama City the checks which were taken at their risk. During the period of unsettlement which followed the failure of the First National Bank of Panama City, Barnes and the agent at Panama City were encouraged by the resident executive officers of the Railway Company to indorse and collect at once checks drawn on the other bank at Panama City, the appellee Commercial Bank. One of these officers talked with the president of the latter bank about it, giving him the impression that the agents might indorse and reduce to cash any checks. The agents of other corporations doing business in Panama City which had no bank account there were in the habit of indorsing checks payable to their corporations and remitting by post-office order or otherwise. After the failure of the First National Bank the Commercial Bank was the only bank doing business within sixty miles. Barnes had an individual account there. He began in 1932 to bring checks payable to himself or himself as agent, or to the Atlanta & Saint Andrews Bay Railway Company, indorse them appropriately, and either get the cash or take credit for them, or take part cash and part credit. He also deposited some currency, his own pay checks, and pay checks of others indorsed to him, and other unidentified credits. He frequently withdrew cash, and his checks were honored. He received credit for three notes given by him of $150, $100 and $100, respectively. These were as they matured charged by the bank to his account, the last absorbing the balance after Barnes was discharged and this controversy had arisen. About $12,000 of these checks belonging to the Railway Company and payable in the several ways above indicated are shown to have been cashed in whole or in part or credited to Barnes at the Commercial Bank. Barnes as agent would usually receive $450 to $750 per month in cash, besides the freights known to have been paid in checks. The cash remittances to the depository at Dothan were scant, and for months at a time wholly absent, so that the larger part of his shortage was probably due to the direct diversion of cash.

The Railway Company brought a bill in equity in the District Court for an account against Barnes and the Commercial Bank, and two other concerns which were claimed to have participated in the misappropriations of Barnes. As to the two latter, a decree was had in favor of one and against the other, and there is no appeal as to ei-

ther. Barnes answered that he had authority to do all that he did, that he had not misappropriated any of the checks or money but had accounted in his monthly statements to the Railway Company for all. He did not, however, appear to testify or defend or explain his records in his office or those at the bank, and decree went against him for $25,801 principal on the testimony of the Company's auditors. He has not appealed. The Commercial Bank was sought to be held liable not only for the sum of the three above mentioned notes which it had charged against Barnes' deposit account but also for all the Company's checks which had been handled by the bank for Barnes, listing especially those from May 30, 1932, to May 11, 1933, amounting to about $11,000, the proceeds of which it alleged the Bank had aided and abetted Barnes in misappropriating, either knowing, or having knowledge of such facts as would charge it with notice, that Barnes was misappropriating and embezzling such proceeds through the facilities of the Bank. The decree was against the Bank for $350 representing the notes, plus interest, but in its favor otherwise. The Railway Company appeals from the last named judgment, insisting that the decree should have held the Bank for all the sums claimed.

The cases are numerous touching the liability of banks where trust funds have with its knowledge, actual or constructive, been deposited by a customer in his individual account and afterwards misapplied. They are not harmonious nor are they all satisfactory in reasoning or conclusion.[1] The difference is wide and fundamental, though not always noted, between misapplications made by the bank itself or made for its benefit, and those in which the bank merely pays to other persons checks regularly drawn against the account. Where the bank gets the trust money by the customer's check or by way of set off or in the assertion of its banker's lien to pay individual debts due to it, there is the ordinary case of tracing a trust fund. If the bank has thus taken either the original trust property or its proceeds in any identifiable form it must surrender them unless it can show that it is a bona fide purchaser without notice. This it cannot do when in taking over the fund it either actually knew of the trust, or the circumstances evident to it are sufficient to excite enquiry and to lead to knowledge, for knowledge is imputed of all that enquiry would have disclosed.[2] These well-established principles have a just and equitable application in such a case, for the bank loses nothing except what it should never have had. When, as here, only antecedent unsecured debts are surrendered by the bank it is in no way injured by having to restore the money it took, for it can·have its notes back as they were:

When, however, the bank is sought to be held, not for what it has that belongs to another, but to pay that other what the bank did not retain but which still others got, the result is very different, and so ought the applicable principles to be. The trust fund is not then traced unto the hands of the bank, but out of them into those who got the money on the checks which the customer drew. The bank has nothing which it ought to surrender, but is sought to be punished for surrendering the money to the wrong persons. The checks being regularly drawn, it is the bank's general duty to pay them so long as the funds in the account last, without enquiring into the propriety of the customer's orders to pay the payees. The bank may and should assume the customer's honesty and correct conduct of his business. That a trustee, with the bank's knowledge, deposits trust money in his individual account it not always nor ipso facto a conversion of it. Munnerlyn v. Augusta Bank, 88 Ga. 333, 14 S.E. 554, 30 Am.St.Rep. 159 & Note; Maryland Casualty Co. v. City National Bank, 6 Cir., 29 F.2d 662; Farmers' Bank v. U. S. Fid. & G. Co., 5 Cir., 28 F. 2d 676.[3] The Bank thereafter cannot itself take that trust money for its own uses, or to pay the depositor's individual note, Conqueror Trust Co. v. Fidelity & Dep. Co.

---

[1] An excellent analysis and discussion of the subject is found in 7 Am.Jur., Banks, § 517, and following, with citation of the principal cases.

[2] When the bank neither gave credit nor altered its position because of the trust deposit it must surrender the trust money though received without notice. Beaver Boards Co. v. Imbrie, D.C., 287 F. 158, 163, affirmed 5 Cir., 295 F. 611.

[3] Other cases are collected in 9 A.L. R. 346, Empire Trust Co. v. Cahan, 274 U.S. 473, 47 S.Ct. 661, 71 L.Ed. 1158, 57 A.L.R. 921, and 64 A.L.R. 1404. A very recent and comprehensive review of them is found in Quanah, A. & P. Ry. Co. v. Wichita State Bank & Trust Co., 127 Tex. 407, 93 S.W.2d 701, 106 A.L. R. 821.

of Md., 8 Cir., 63 F.2d 833; Central National Bank v. Insurance Co., 104 U.S. 54, 26 L.Ed. 693; Union Stock Yards Nat. Bank v. Gillespie, 137 U.S. 411, 11 S.Ct. 118, 34 L.Ed. 724; but it may ordinarily pay it over to the depositor himself or to his order. This is so because the depositor either before or after making the deposit of the trust money may have become individually entitled to it, or the check by which he orders it paid out may be for the proper uses of the trust. It is only when the bank knows that an actual misappropriation is intended or is in progress that it should decline such a deposit or refuse to honor regular checks against it on pain of being itself held liable for misappropriation. The penalty thus visited ought to be supported by the mala fides of a fraudulent intent, or by a negligence so great as to show wilful ignorance. Simple neglect to enquire about circumstances which ought to have excited attention is not enough, just as it is not enough to prove a want of good faith in purchasing negotiable paper. Connecticut Fire Ins. Co. v. Commercial Nat. Bank, 5 Cir., 87 F.2d 968. Commercial transactions are not put within the strict fetters of constructive notice. Thus in Allen v. Puritan Trust Co., 211 Mass. 409, 97 N.E. 916, L.R.A.1915C, 518, dishonesty is made the test, and recovery against the bank denied as to checks touching the payment of which it had no actual knowledge or suspicion of wrong, although it was held to know that the fund was a fiduciary one. We would not follow the decision in Goodwin v. Amercian National Bank, 48 Conn. 550, in which the bank was relieved even as respects the wrongful paying out of public money, with the remark that a trust must look for its protection only to the integrity of those who act for it. For in Farmers' Bank v. U. S. Fid. & Guar. Co., 5 Cir., 28 F.2d 676, we held a bank liable which paid checks, drawn against a sheriff's individual account, out of public money to his credit in another account headed "Tax account" on his verbal instruction to do so. Under the state law the sheriff could pay over tax money collected by him only to the tax collector, so that payment to anyone else was necessarily unlawful, as the bank knew. Public money in this connection stands in a class by itself. We discussed the liability of a bank for paying out trust funds on dishonest checks of its depositor in American Surety Co. v. Waggoner Natl. Bank, 5 Cir., 83 F.2d 99, 102, and confined it to cases of actual knowledge of misappropriation or of bad faith, rejecting constructive notice as a basis. We said: "Though a bank is liable for loss of trust funds deposited with it when, having knowledge of the character thereof, it acts in bad faith by conniving with the fiduciary in converting them, the bank's duty is a negative one not to participate in a breach of trust. The test is whether it acts in good faith. * * Integrity and good faith are exacted, but the transactions of banks should not be clogged and hampered by unreasonable burdens of supervision over the activities of its depositors. If the bank does not participate in the fraud with knowledge that a breach of trust is intended, or does not know of suspicious circumstances which render the bank guilty of bad faith in failing to enquire further, the bank is not liable for honoring a fiduciary's check payable to himself." In Cahan v. Empire Trust Co., 2 Cir., 9 F.2d 713, where a son under general power of attorney from his father drew funds of his father in other banks by checks in his own favor signed as such attorney and deposited them with Empire Trust Company and then checked the proceeds out for his own purposes, the Trust Company was held liable as a matter of law. The Supreme Court reversed, 274 U. S. 473, 47 S.Ct. 661, 662, 71 L.Ed. 1158, 57 A.L.R. 921, and said that the Trust Company was not bound to assume that the checks it paid were for an improper purpose, but it was added that the generality of the power of attorney and the relation of parent and child and the failure of the father for a long time to look into his own bank accounts were all to be considered. Some stress was laid on the fact that the checks deposited with the Trust Company were certified, but it was added that the certification did not mean that the certifying bank knew what the son was going to do with the money and would use it rightly. The case was sent back for a new trial, with the concluding words: "The transactions of banking in a great financial centre are not to be clogged, or their pace slackened, by over-burdensome restrictions." We suppose the opinion means that there might be liability, but only if under all the circumstances it was clear that in honoring the son's checks the Trust Company knew he was misappropriating his father's money. It would be profitless to review other decisions of less authority.

In the case before us the court held that the Bank could not withhold from the

true owner, the Railway Company, the funds which it retained in payment of the individual notes of Barnes, not being a bona fide purchaser for value without notice. It was held that no sufficient case was made to impose liability for the checks paid out to others as a knowing aiding and abetting of misappropriations of the Railway's money. Barnes' account was active, but as balanced on the ledger at the end of each month seldom showed more than a few dollars on hand. The largest balance was $135.00. Though the Bank knew that checks originally belonging to the Railway Company were being deposited in it the money was mostly gone by the first of the month, at which time it knew Barnes made his settlements. The general impression, without suspicious analysis, would be that the deposits were temporary, and if not withdrawn as cash and thus sent to the depository at Dothan, were accounted for honestly otherwise. Barnes was known to be under $5,000 bond, to hold a responsible position, to have a salary and to have a trucking business in which he earned from the Railway Company alone, according to its accountant, $30 to $100 per month. Since Barnes did not produce his checks, we do not know how much of them was for cash which might have been supposed to go to the depository at Dothan, or how much went to other persons, nor for what, save one cashier's check purchased payable to Sears Roebuck & Co. That Company checks should be cashed or deposited at Panama City instead of being sent to Dothan where the Railway Company's depository was known to be would seem significant, except for the peculiarity of the situation and the times. The Bank was the only bank in the neighborhood. It was small and under some suspicion because of the First National's failure, and because of its own reorganization and the general strain on banks until the crash and bank holiday of March, 1933. Neither the Railway Company nor the large corporations doing business in and around Panama City kept an account with this lonely bank, so that check collections, handled rapidly in fear of some bank failure, were by local agents with unusual eagerness and some irregularity reduced to cash. Both Barnes who proved dishonest, and the agent at Panama City who proved otherwise, indorsed and cashed at the Commercial Bank railroad checks variously made out, and the railroad officials knew it was being done, did not forbid it, and apologized to the

Bank for thus demanding cash. The Southern Kraft Corporation was known to be controlled by the same interests that controlled the railroad, and their executive officers were in part the same persons. The Bank, though it was not a depository for the Paper Company, was endeavoring to provide cash to pay its employees for their pay checks, and was handling a good deal of its paper besides what Barnes brought there. With considerable strain the Bank was striving to serve the community in a strenuous time, and doing business under unusual circumstances. Things that would ordinarily have excited notice and required explanation might have seemed less irregular. We think the court was justified in holding that the presumed innocence and good faith of the Bank have not been disproved. A critical analysis of Barnes' account in the light of developments now makes it plain that several times withdrawals were paid out of a recent deposit of some railroad check, but they were relatively small, and do not exclude the reasonable supposition by the Bank that Barnes· was taking care of such cases in his accounting with the Company. There is nothing sufficient to require a belief that the Bank was knowingly aiding Barnes to steal.

It is argued that when Barnes suffered the Bank to pay his individual notes out of the Railway Company's money it necessarily knew he was dishonest and it handled his account thenceforth with responsibility for his misappropriations through it. Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, L.R.A.1916F, 1059, is relied on. We are not prepared to indorse so sweeping a rule of liability irrespective of knowledge and good faith in the subsequent dealings; but the doctrine would not apply to the facts here. Barnes apparently did not pay the notes but the bank took pay for them. If there was misappropriation the bank did it. But the first note of $150 charged to the account September 2, 1932, was paid by a deposit made that day of $185.75, no part of which appears to have been railroad funds. The second note of $100 charged April 3, 1933, was paid from the proceeds of railroad checks, but it could have been unknown to Barnes till he received his bank statement the following month. On April 28th the account is credited with note $100, which is probably the third note, which would seem to offset or replace the wrongful charge out of the previous note. There was a final balance May 31, of $99.22 which paid the last note.

There is small basis here to say there was any transaction which the bank positively knew was dishonest on the part of Barnes, so that good faith was lacking on the bank's part in honoring his checks thereafter.

■ In handling Barnes' account at most there was negligence, a failure in some duty in paying out that may be supposed to arise when a bank knows that money possibly or probably belonging to another is involved. In every liability based on negligence the diligence of the injured party is a material element. Contributory negligence defeats liability at common law and in Florida. Equity everywhere says, Vigilantibus, non dormientibus, subvenit equitas. The head of the accounting department of the Railway Company who was also its vice-president admits that it was unusual and not good business not to have audited the agency of Barnes in over two years, and that an audit of it would have disclosed the shortage. The agency was less than two miles from his own office. He also admits that the duplicate deposit slips sent his office by the Dothan depository every time Barnes made a remittance would have shown that he was sending in far too little cash, if anyone had noticed it. The only reason given why Barnes' accounts were not audited was that he was regarded as upright, was under bond, and it was not thought he could possibly embezzle much without exposure. These were the very things that put the Bank off its guard. We do not think simple negligence in the Bank in not discovering the dishonesty of the depositor is sufficient to put the loss on it, but if it be, we should hold that it cannot be asserted by one who has been thus remiss in the customary and reasonable examination of his own business and records, when diligence would likely have prevented the loss.

■ The position is taken by appellant that many of the indorsements by which the trust funds were deposited were wholly unauthorized, and that the Bank therefore acquired no right either legal or equitable to collect the checks, and is liable irrespective of bad faith or negligence. The court found that there was ostensible if not actual authority to indorse all the checks. As to the checks for which Barnes was personally responsible, that is all except the checks of Southern Kraft Corporation, St. Andrews Bay Lumber Company, and Waterman Steamship Company, Barnes was chargeable with the cash which alone he was authorized to collect. When he took a check, it was but a means for him to get the cash. Probably he was not authorized to make a contract of indorsement binding the Railway Company upon them, but he could so indorse them as to get the money on them, whether they were payable in Panama City or elsewhere. Some of them he sent to the depository at Dothan. If any were not paid, he was held personally on his indorsement of them and they could be and were charged back to him. As to the checks of the above-named corporations, Barnes took them as the final property of the Railway Company and had no actual authority to do anything with them except to indorse them with his rubber stamp for deposit only and send them to the depository. The public, including the Bank, did not know of the difference in his authority as to these checks. It would not be unreasonable to treat it as a secret limitation on his authority, unknown to the Bank, which was justified in supposing from what was going on with the knowledge of the railway officials that Barnes' authority to indorse and collect checks was general. But supposing that there was a total want of power in Barnes to transfer these checks to the Bank so as to authorize it to collect them, then the payment of them was no payment, the freight bills stood unpaid, the drawers of the checks could return them to their banks as not properly paid, and the appellee Bank if liable to anyone would be liable to its indorsee. The record shows that this course in fact was attempted to be followed, and failed. The Railway Company is not now suing its customers. It is not suing for its physical checks, or their value, as having been converted. It is seeking an account of *their proceeds* in the hands of Barnes and the Bank. It necessarily ratifies the means by which the checks were turned into proceeds, just as one does who elects to sue for the proceeds of his chattel wrongfully sold by another. The case is pleaded as one for the misappropriation of the proceeds. The question of apparent authority in Barnes is a matter to consider in connection with the Bank's good faith, but a want of authority is not here a ground for recovery.

■ It is lastly claimed that the recovery should have been for $119.35 more because the Bank's books on their face show that additional amount to be due. The account shows a debit to Barnes on March 4, 1932, of $119.35 and a credit March 16 of the same amount. There is a deposit slip dated

March 4, for $119.35, but none March 16. It is argued that the debit entry on March 4·was a mistake and the entry on March 16 was intended as a correction, which indeed offset the error of the debit on March 4, but did not give credit for the deposit. The contention is plausible but not sustained by evidence that there was really no debit. If on March 4 there was a check paid or cash drawn of $119.35, and only an omission to credit the deposit, the entry of it March 16 was all that was needed. Not knowing whether the debit on March 4 was a mistake, or a proper charge, we cannot overrule the lower court in sustaining the books as they stood for more than a year before the account was closed.

Judgment affirmed.