In the Matter of Elizabeth F. NEW-HOUSE, George C. Fry, Jr., Olney M. Fry, and Sheridan Brooks Fry, Plaintiffs,

v.

The CANAL NATIONAL BANK OF PORTLAND, as an individual person, and in its capacity as trustee under a Mortgage Indenture with the Estate of Mary J. E. Clapp, dated June 1, 1922, and an Extension Agreement dated as June 1, 1937.

Sidney St. F. Thaxter, as an individual person and in his capacity as trustee under the will of Mary J. E. Clapp, and Montgomery Blair, Jr., as an individual person and in his capacity as trustee under the will of Mary J. E. Clapp, Defendants.

Civ. No. 689.

United States District Court
D. Maine, S. D.
Sept. 10, 1954.

240

Jacob H. Berman, Edward J. Berman, Sidney W. Wernick, Clement F. Robinson, Portland, Me., for plaintiffs.

Leonard A. Pierce, Charles W. Allen, Portland, Me., for Canal Nat. Bank of Portland.

Sidney W. Thaxter, Portland, Me., for Sidney St. F. Thaxter and Montgomery Blair, Jr.

CLIFFORD, District Judge.

This is an action by Elizabeth F. Newhouse, George C. Fry, Jr., Olney M. Fry, and Sheridan Brooks Fry for an accounting and to recover trust income paid to a third party allegedly in breach of trust. The plaintiffs are certain of the beneficiaries of a trust established under the will of Mary J. E. Clapp.[1] This action is against Sidney St. F. Thaxter and Montgomery Blair, Jr.[2] individually, and in their capacity as trustees under the will; and against the Canal National Bank of Portland,[3] a third party, individually,

---

1. Hereinafter referred to as the "Will".

2. All of the trustees under the Will will be referred to as the "Trustees" irrespective of their date of appointment.

3. Hereinafter referred to as the "Bank".

and in its capacity as trustee under a mortgage indenture with the Clapp estate.

Plaintiffs Elizabeth F. Newhouse, George C. Fry, Jr., and Olney M. Fry are residents and citizens of states other than the State of Maine, and are the only children of George Gardiner Fry, one of the beneficiaries named in the will, who died in March 1937. Since the death of their father, these plaintiffs have been entitled to receive each a $\frac{1}{12}$ share of the net income, if any, of the testamentary trust of the residuary estate created by the will, and have taken an active interest in the affairs of the trust. Edgar L. Newhouse, husband of Elizabeth F. Newhouse, acted for his wife and occasionally for her two brothers during the years with which this Court is concerned.

The other plaintiff, Sheridan Brooks Fry, is the only child of Alfred Fry, one of the beneficiaries named in the will, who died on December 5, 1933. He is entitled to $\frac{1}{4}$ share of the net income of the estate.

The defendants, Sidney St. F. Thaxter and Montgomery Blair, Jr., were duly appointed and are still acting as trustees under the will. Sidney St. F. Thaxter was appointed on March 25, 1924, to succeed David W. Snow, one of the original trustees. Montgomery Blair, Jr., was appointed on January 30, 1941, to succeed Gist Blair, the other original trustee who died on December 16, 1940. Gist Blair, a member of the Clapp family, was an income beneficiary under the will and an active participant in all the affairs of the trust. No major decision concerning the estate was made during his lifetime without consultation between him and his co-trustee.

Prior to the trial of this case upon its merits, this Court raised the issue of jurisdiction. After a hearing, it was found that the present action did not involve purely probate matters and would not interfere with the future administration of the trust or the power of the state probate court over the corpus of the trust. This Court held, therefore, that it had jurisdiction in equity to consider and determine the issues here presented. Newhouse v. Canal National Bank of Portland, D.C., 94 F.Supp. 830.

At the pretrial conference of this case, it was agreed to limit the evidence to the issue of liability and that the question of damages would be considered later, if necessary.

Briefly, the plaintiffs allege that the trustees without authority paid trust income to persons other than beneficiaries of the trust and therefore committed a breach of trust. In seeking reimbursement for the moneys so paid out, the plaintiffs have joined the Bank as a constructive trustee, contending that it participated with the trustees in the alleged breach of trust. The plaintiffs do not contend, however, that the defendants were guilty of any fraud or bad faith and the case is entirely free from any intimation in that regard.

The material facts of this case are as follows: Miss Mary J. E. Clapp died in September, 1920, in Portland, Maine. Her will was probated and allowed in the Probate Court of Cumberland County in the following month. There was included in the residuary trust created by the will the Homestead lot, so-called, on which was built the house which had been occupied by the Clapp family as their home. By the twelfth clause of her will, Miss Clapp directed that the Homestead lot be retained by the trustees during the entire life of the trust and that "no portion thereof be sold or otherwise disposed of except by ordinary and customary leases." In her will she directed that the house on the Homestead lot be taken down and that, in its place, "a handsome, imposing, and substantial block" be erected in memory of her father and grandfather, to be "especially adapted for occupancy by stores, offices, and halls." She further authorized the trustees to use any other portions of her real and personal estate as were necessary for the purpose of erecting the Clapp Memorial Building. She recommended that the construction of the Clapp Memorial Building should cost not less than $300,-000.

David W. Snow and Gist Blair were the original trustees. In 1922 they instituted equity proceedings in the Supreme Judicial Court of Maine, seeking a determination of their authority, under the terms of the will, to borrow money on the credit of the estate, enforceable against the entire assets of the trust; And further requested authority to borrow money and procure loans, to give promissory notes, bonds, or other obligations in their capacity as such trustees, to be enforceable against the entire trust estate, except said Homestead lot. The defendants in said proceeding were the then beneficiaries of the trust, being all the persons then in being who had any interest either in the income or principal, and included the plaintiffs in the case at bar. On May 10, 1922, Justice Scott Wilson of the Supreme Judicial Court of Maine, issued a final decree which provided that the trustees were authorized under the terms of the will, for the purpose of erecting the Clapp Memorial Building, "to borrow money and procure loans from time to time, to give promissory notes, bonds or other obligations in their capacity as trustees, enforceable against the whole trust estate, except said Homestead lot."

Pursuant to this decree, the trustees under the will executed and delivered to the Bank a mortgage indenture providing for the issue of $300,000 principal amount of bonds secured exclusively by the so-called Clapp or Schulte Block property. At the same time, $300,000 principal amount of bonds were issued under the mortgage indenture, such bonds being in the form prescribed by the decree. The bonds bore interest at the rate of 6% per annum, and matured by their terms on June 1, 1937. The entire proceeds from the sale of the bonds were used by the trustees for the erection of the Clapp Memorial Building. At all times thereafter the Homestead lot consisted of the Clapp Memorial Building and a lot for the parking of motor vehicles situated in the rear thereof.

The Bank, in addition to being the trustee of the mortgage indenture, also functioned as the bank in which the trustees deposited the funds to meet the mortgage payments.

Under the terms of the will, dealing with the Homestead lot and the building to be erected thereon, it was specified that: "The net rents thereof and of whatever buildings may be thereon shall be taken as a part of the net income of the trust aforesaid * * * subject to the special provision herein concerning the same." The will also contained the following provisions: "The entire net income of the trust, except as otherwise provided in this my last will and testament, shall annually, or oftener, at the discretion of said Trustees, be paid over to or applied for the benefit of" the designated beneficiaries.

No claim is asserted here by the plaintiffs for rent received from the Clapp Memorial Building prior to 1934. However, for years prior to 1934 the trustees had commingled all of the income of the trust estate, including the rentals from the Clapp Memorial Building. From that fund they paid the interest due on the bonds under the mortgage indenture, paid other expenses incidental to the administration of the trust, and paid the balance of such income to the named beneficiaries under the will.

Beginning in 1934, the net income from the estate materially decreased as the result of the bankruptcy of a tenant which had been paying a substantial rental. Thereafter, until May, 1947, the trustees used all of the income, including that from the rentals of the Clapp Memorial Building, in payment of the expenses of administration of the trust and the interest due on the mortgage bonds. In short, they continued the practice followed by them from the inception of their duties as trustees.

At the maturity of the bonds, on June 1, 1937, the estate desired an extension of time for the payment of the principal of the bonds. Accordingly, an extension agreement was entered into in May 1938, as of June 1, 1937, between the trustees, the Bank and the holders of the bonds. Under the extension agreement, the time

for payment of the bonds was extended to June 1, 1947. The bonds, as extended, were to bear interest at the rate of 4% per annum, instead of at the original rate of 6%. In addition, there were attached to the bonds non-cumulative income coupons entitling the bondholders to share, to an amount not exceeding 2% per annum, in the annual net income of the estate, determined as provided in the extension agreement.

To advise it in connection with the execution of the extension agreement, the Bank employed, as counsel, the late William B. Nulty, a Maine attorney of recognized standing, who later was appointed to and served as a Justice of the Superior and Supreme Judicial Courts of Maine. The detailed opinion furnished the Bank by Mr. Nulty contained no suggestion that it was incumbent upon it to inquire into the source of the funds deposited with it by the trustees for the payment of the coupons. His opinion was substantially in accord with that furnished the Bank by Mr. William S. Linnell, likewise, an attorney of wide experience and ability, who was consulted by the Bank in connection with the 1922 mortgage indenture. Actually, the extension agreement by Paragraph Third (particularly the third and fourth paragraphs therein)[4] specified that the net income of the estate of Mary J. E. Clapp was available for payment of the coupons, and was void of any specific ref-erence relating to the income from the Clapp Memorial Building.

All of the annual accounts, filed by the trustees for the years 1934 through 1946, inclusive, clearly indicated that the bond interest was treated as a charge against the general income of the estate, and that it would have been impossible to pay the interest due on the bonds if the net rents from the Clapp Memorial Building had not been available for such purposes. These accounts were prepared, audited, and presented to the Probate Court by accountants and attorneys of proven ability. Copies of the accounts for these years were sent to and received by the plaintiffs Elizabeth F. Newhouse, George Gardiner Fry, Jr., and Olney M. Fry after the same had been filed in the probate court together with notice of the date set for the hearing thereof. After public notice and in accordance with the rules of the probate court, all such accounts were duly allowed by the late Judge Carrol S. Chaplin, probate judge for Cumberland County, a man who had served wth distinction in such capacity for many years.

Copies of these accounts were, likewise, filed with the Bank at the close of each calendar year. There was at all times on file in the office of the Bank a copy of the will and mortgage indenture, and, after their execution, the Extension Agreement and Supplemental Indenture.

---

4. "The net income available for payment upon non-cumulative income coupons due on June first of any year shall be the net income of said Estate of Mary J. E. Clapp for the calender year ending on the thirty-first day of the preceeding December, as determined from an account of the Trustees under the Will of Mary J. E. Clapp for such calender year duly approved and allowed by Judge of Probate within and for the County of Cumberland, in the State of Maine, by deducting from the gross income of said Estate of Mary J. E. Clapp as set forth in said account

"(A) All expenses of administration, operation and management of said estate (including, but without limiting the generality of the foregoing, expenses for repairs and maintenance, interest on current bank borrowings, commissions of Trustees', taxes, and 4% interest on bonds) which are in said account charged against income. It being understood and agreed by said Bondholders that, subject to the approval of the Judge of Probate, all Trustees' commissions may be charged against income without regard to the method by which the amount of such commissions may be determined.

"(B) Amounts set forth in said account as paid to one Catherine McGrath.

"In determining the net income for the calender year 1937, there shall be deducted from the gross income, in addition to the deductions above provided, all expenses of every nature incurred by the Estate and Trustee in connection with this Extension Agreement and extending said Bonds whether paid in the calender year 1937 or subsequently."

During the thirteen year period between 1934 and May, 1947, none of the annual accounts of the trustees, with one exception, was objected to or appealed from by these plaintiffs or any other of the beneficiaries of the trust. This objection was made to the account for 1934, by the father and predecessor in interest of three of the plaintiffs here, and by one other named beneficiary. There was no claim made in this objection that the trustees were not authorized to use income from the Clapp Memorial Building to pay coupons. A full hearing was had on the objections in 1935. The judge of probate, shortly thereafter issued his findings and decree, in which he approved and allowed the account as filed with one minor exception. An appeal was filed from this decision, was heard and then dismissed by the Supreme Court of Probate. The objecting parties failed, thereafter, to exercise their right to pursue their remedies in the Supreme Judicial Court of Maine by exceptions or appeal, and, for all intents and purposes, that was the end of the case.

In the spring of 1938, some time after the 1937 conference hereinafter mentioned, Olney Fry made an informal objection to the 1937 account filed by the trustees in the probate court. By letter to Judge Chaplin, he requested that approval of the account be delayed until the question of the non-payment of taxes on a relatively small part of the estate was explained. After Judge Chaplin and the trustees explained that the taxes on the property were paid by the lessee, Mr. Fry withdrew his objection.

The legal right to use the income of the Clapp Memorial Building, as aforesaid, was questioned for the first time in 1937, at a conference in New York between Edgar Newhouse, George and Olney Fry and trustee Thaxter. The conference took place as the result of correspondence between these parties concerning the conduct of the affairs of the trust estate. At this conference in December, 1937, the general affairs of the estate were discussed, but the main purpose of the conference, apparently, was to determine the question relating to the disposition of the rentals collected from the Clapp Memorial Building. These plaintiffs were then in possession of a written legal opinion from the chief attorney of the company of which Mr. Newhouse was an officer. The opinion was not shown to trustee Thaxter nor a copy given to him and the name of the attorney was not revealed to him. It was the opinion of this attorney that, under his interpretation of the terms of the will, it was improper for the trustees to use the income from the Clapp Memorial Building for coupon payments to the bondholders. Trustee Thaxter informed them at the conference that he was not in accord with this interpretation and opinion; that this matter had been carefully considered by the trustees; that it was their opinion, and the opinion of their attorneys, likewise, that the use made by them of the income from the Clapp Memorial Building was entirely proper; and, by inference at least, indicated that it was their intention to continue to use the Clapp Memorial Building income as they had in the past.

The attorney who had furnished this opinion to Mr. Newhouse informed him that he was not familiar with the law of the State of Maine, and that this was the best he could give him. Notwithstanding the statement made by trustee Thaxter, which was in direct conflict with the opinion given to Mr. Newhouse by the chief counsel of his company, neither Mr. Newhouse nor George or Olney Fry, who were present during the entire conference, took any affirmative action and made no effort to consult a Maine attorney concerning this controversy until many years later. No suggestion or request was made to the trustees that action be instituted in the Maine court for a construction of the will. With the exception of a single letter written by Olney Fry in January of 1939 [5]

5. The letter insofar as it is material to the case at bar reads, in part, as follows:

"I note from your accountings that the property generally known as the

the entire matter was dropped and no action of any kind was taken by them until May of 1947, approximately eight years after the letter and ten years after the New York conference of December, 1937.

The Bank was never informed by any one of the question raised by the beneficiaries; it did not know of the conference of December 1937, of its subject matter or of the existence of the legal opinion therein referred to. Whatever was discussed in regard to the application of the income from the Clapp Memorial Building was only between the beneficiaries and the trustees.

The trustees continued to apply the income of the Clapp Memorial Building, as aforementioned, with complete knowledge on the part of these plaintiffs, and without any objection, either formal or informal by any of them until the spring of 1947. In May of 1947, shortly before the maturity date (June 1, 1947) of the bonds, the plaintiffs renewed their concern in regard to the income from the Clapp Memorial Building. It was evident to the trustees at this time, and apparently to all others, that it would be impossible to meet the payment of the bonds and that it would be necessary for the bondholders to initiate foreclosure proceedings. Apprehensive of the effect upon their interest by such proceedings, the plaintiffs became interested in ascertaining whether an expected deficiency judgment would constitute a claim against the income from the Clapp Memorial Building. These plaintiffs had learned from the trustees that, in their opinion, the bondholders would have a claim against the income from the Clapp Memorial Building as it accrued. They realized that the matter had reached a critical state and these plaintiffs then pressed the trustees for more detailed and specific information concerning their problem. According to Mr. Newhouse, in a letter written to trustee Thaxter:

" * * * matters seem to have reached a crucial stage so I am imposing on you for this information * * *."

In view of the "crucial" situation which had developed and to comply with the demands of the beneficiaries, the trustees obtained a written opinion from their own attorneys, that confirmed the opinion previously held by them and that of the two attorneys for the Bank. The trustees then informed the plaintiffs that they would seek court instructions in an effort to resolve the questions with which they were concerned.

On May 16, 1947, by letter, Edgar Newhouse, apparently representing all of the plaintiffs expressed his disagreement with the opinion of counsel for the trustees, and for the first time enclosed a copy of the opinion rendered by their

---

Clapp block, which is encumbered by a $300,000 mortgage, has been maintained at a deficit of from $10,000 to $18,000 each year, for, I believe, some seven years. It would seem to me that under such circumstances it might be well to sell this property, or permit the mortgage on it to go to foreclosure. I should be most interested to know whether you feel that under the laws of the State of Maine, a deficiency judgment could be taken against the Estate in the event of foreclosure of this mortgage and also to know your estimate as to the amount of such deficiency, if one might be taken. If the Maine laws would not permit a deficiency judgment it would seem to me that the property should be permitted to go to foreclosure at this time.

"Even if a deficiency judgment could be taken by the bondholders upon the foreclosure of the mortgage on the Clapp block, it might even so be to the interest of the Estate to permit the mortgage to go to foreclosure."

The trustees' reply in this regard was as follows:

"You inquire about a deficiency judgment in case of proceedings to foreclose the mortgage on the Clapp Block. The mortgaged property is at present worth considerably less than the amount of the mortgage. This being the case, we are informed by counsel that under the laws of Maine the bondholders would be entitled to a deficiency judgment in a foreclosure suit, and that such judgment would constitute a claim not only against the existing assets of the Estate (except the original homestead property) but also against all income * * *."

counsel which had been prepared by him approximately ten years before. And this letter [6] explains their views concerning the proposed action by the trustees relating to the request for court instruction.

Also, on May 16, 1947, at the request of the Bank and in accordance with the terms of the original mortgage indenture, the trustees executed a supplemental mortgage indenture, conveying to the Bank, as further security for the payment of the bonds, all the remaining unencumbered real estate of the trust, with the exception of the Clapp Memorial Building and the parking lot in the rear thereof.

Notwithstanding the objections noted by Mr. Newhouse, the trustees filed on May 26, 1947, a bill in equity, seeking clarification and instructions relating to their authority to use income from the Clapp Memorial Building in the payment of either interest or principal of the bonds. On June 1, 1947, the estate defaulted in the payment of the principal and the six months' interest which was then due. On June 17, 1947, the Justice before whom the bill in equity had been brought appointed the trustees as temporary receivers to collect the income from the entire estate, to pay the necessary operating expenses, and to hold the balance of the income subject to the further order of the state court.

The Bank, on October 8, 1947, filed a petition seeking leave to institute proceedings to foreclose the mortgage, and nine days later the petition was granted. All of the parties herein were parties to that foreclosure proceeding and were represented by the same attorneys who are representing them in the case at bar. Answers were filed for the plaintiffs in that case. Their answers do not disclose any claim against the proceeds of the sale under the foreclosure proceeding for reimbursement of past interest payment which had been made to the bondholders from the rental income of the Clapp Memorial Building.

Following notice, a hearing was had in May, 1948, and on June 9, 1948, the Bank filed a draft of a decree appointing a permanent receiver and ordering foreclosure and sale of the mortgaged property. That decree provided that the proceeds received from the sale should be applied to the payment (a) of the debt secured by the lien of a prior mortgage, costs, and expenses of the proceedings, and certain other expenses; (b) of the amount due and unpaid on the bonds secured by the mortgage indenture and (c) of the surplus, if any, to the estate of Mary J. E. Clapp. Written notice of the proposed decree, with a request for sug-

6. The letter written by Mr. E. Newhouse, Jr., to trustee Sidney St. F. Thaxter, dated May 16, 1947, reads as follows:

"Replying to your letter of the 8th instant, I am not at all convinced by the opinion of your counsel that the trustees are empowered to apply the net income of the Memorial Building to the payment of interest on or the principal of the bonds; indeed, my counsel is of quite the contrary opinion and I enclose herewith a copy of his advice to me of December 18, 1937. The opinion letter of your counsel of May 3, 1947, with which you seem to be in agreement, does not attempt to discuss the matter; moreover, I do not see any occasion for your acting upon it at this time. If and when the bondholders seek to attach the income of the Memorial Building it will be the duty of the trustees, as I see it, to resist to the utmost; and to seek a contrary ruling now is not in the interest of the beneficiaries.

"I have not yet received a copy of the proposed bill in equity requesting the court's instructions, and if it has not been filed I trust you will indulge us the delay necessary to enable us to give it full consideration.

"Nor am I in agreement with the proposal to seek an extension from the bondholders. The mortgage properties are doubtless a total loss but it does not follow that the beneficiaries are to be properly deprived of that part of the estate which was to remain unencumbered. There is no assurance that market conditions will improve and a deficiency judgment now would probably be in lesser amount than at any future time.

"In view of the above, it would be inconsistent to assent to the payment of bond interest due June 1 out of income from the Memorial Building.

"Very truly yours,
"S/Edgar L. Newhouse Jr."

gested corrections to be filed by June 16, 1948, was given to the attorneys for plaintiffs herein. This was done in accordance with the Maine Equity Rules. On June 16, 1948, no party objecting thereto, or suggesting corrections therein, the proposed decree was signed.

The auction sale was held pursuant to the decree and on August 27, 1948, the Bank petitioned that the sale be confirmed. The mortgaged property was sold at auction for $227,150. The amount then due on the mortgage was $294,000. On September 20, 1948, after written notice to all counsel and by publication, a hearing was had and the sale confirmed. On October 11, 1948, after hearing, the special master was ordered forthwith to pay the Bank the sum of $205,000, to be disbursed by the Bank in accordance with the decree of June 16, 1948. The order further directed that the Bank pay out $201,798.00 as partial distribution to the bondholders, and retain the balance of $3,022, subject to further order of court. The order further directed that public notice also be given to the bondholders of said partial distribution.

Pursuant to this court order of October 11, 1948, a notice was published in newspapers in Portland and Boston that on October 22, 1948, a partial distribution of $201,978 would be made to the bondholders at the Bank. None of the funds received by the Bank from the foreclosure proceeding and paid out to the bondholders pursuant to the decree and order of the court consisted of income from the Clapp Memorial Building. By November 1, 1948, the Bank had disbursed to the bondholders $143,000; by December 1, 1948, all of the said money had been disbursed except $13,000; and by April, 1949, the undisbursed amount was reduced to $3,300. The plaintiffs were parties to the foreclosure proceedings and interposed no objection to this order of the court aforementioned.

On May 27, 1948 evidence was taken out with respect to the bill in equity by the Honorable Edward F. Merrill, then a justice of the Superior Court of Maine, and was reported to the Supreme Judicial Court for its consideration. On June 13, 1949, some thirteen months later, the Supreme Judicial Court of Maine rendered its decision in the Will Construction case. It held that the bondholders, and the Bank as trustee under the mortgage indenture, were precluded by the terms of their contracts with the trust from enforcing any judgment against the Homestead lot, and that they were not entitled to have the income from the Clapp Memorial Building applied in payment of either the interest or the principal of the bonds. The Court further held that the trustees were authorized to pay the income from the Clapp Memorial Building, then in their hands, to the beneficiaries.

A secondary issue before the Supreme Judicial Court at that time was the legal status of Sheridan Brooks Fry, as a beneficiary of the trust, in view of certain provisions of a codicil to the will. When this question had first arisen in the administration of the trust in December, 1933, the trustees had construed those provisions to exclude the said Fry from any beneficial rights because of his marital status and so informed him. Sheridan Brooks Fry was in accord with this construction by the trustees. In the 1949 decision, the Maine Court held that Sheridan Brooks Fry was not precluded by those provisions from participating in the income of the estate.

At no time prior to December, 1946, did Fry assert to the trustees any claim to any benefits from the estate. The Bank had no knowledge or notice of any question being raised concerning the right of Sheridan Brooks Fry as a beneficiary until the May 1947 Will Construction proceedings were instituted.

Not until after the Supreme Judicial Court of Maine had rendered its decision in the Will Construction case did any of the plaintiffs assert a claim that either the trustees or the Bank were under any legal liability to them because the Clapp Memorial Building income had been used to pay coupons, or that any part of the proceeds of the foreclosure sale should be paid to the plaintiffs because of the prior

payments of coupons out of said income. Nor did any of the plaintiffs notify the Bank or any other party to the foreclosure proceedings that the receiver, special master, or the Bank should retain any such funds until their rights, if any, against either the bondholders, the trustees, or the Bank had been determined.

In October, 1949, shortly after the Bank had petitioned for the allowance of fees and expenses, and for leave to distribute the balance to the bondholders as a final distribution, it received notice for the first time that the plaintiffs contemplated a suit against either the Bank or the trustees. At this time the Bank had in its possession $10,841.24, representing the balance of the proceeds of the foreclosure sale. Because of the contemplated suit, the petition for final distribution was continued and no further action thereon has yet been taken.

During the period relevant to this litigation, the Bank never owned or held any of the Clapp estate bonds nor received any of the coupon interest money, either in its own right, or as trustee for the testamentary or inter vivos trusts, or as executor. The only exception was one such bond owned by a person at the time of his death, which came into the possession of the Bank as executor of his estate in 1941. This bond was promptly disposed of by the Bank, along with other estate assets, in less than one year thereafter.

The Bank merely received and disbursed the money it received from the trustees for the payment of coupon interest, all of which was done in the normal course of business. As compensation for its services as paying agent, and for its other functions relating to the bond issue, the Bank received only the usual nominal charge therefor. Primarily, it acted as a conduit to transmit the money from the trustees to the bondholders. At the time this action was commenced, the only money in its possession, deposited for the payment of coupons, was $9.31.

The basis of this present action is the decision of the Supreme Judicial Court in the Will Construction case. Thaxter v. Canal National Bank, 144 Me. 176, 67 A.2d 21. That decision determined the rights of the parties with respect to the present and future net rents of the Clapp Memorial Building and did not involve the issue of past rents already paid out, with which this Court is now concerned. To decide the issue of future rents, however, the state court construed the will and the contracts and decided that the beneficiaries and not the bondholders were entitled to the future income from the Clapp Memorial Building. This Court is of the opinion that it is governed by this decision insofar as it relates to the proper construction of the will, as well as to the meaning of the 1922 decree. The trustees, therefore, committed a breach of trust set up by the will when they diverted the net rentals of the Clapp Memorial Building from the beneficiaries of the trust and used those net rentals to pay the bondholders' interest on the bonds. Despite the evil connotations of the term "breach of trust", it is again to be noted that there is not the slightest element of anything savoring of fraud or bad faith on the part of the trustees in this case. Under the facts and circumstances of the instant case, the breach was wholly of a technical nature.

As an affirmative defense to the breach of trust as alleged by the plaintiffs, the trustees rely upon the exculpatory or exoneration clause of the will. It provides as follows:

"Each Trustee shall be holden only for his own neglects and defaults, and neither shall be answerable for those of the other or for any banker, broker or other persons with whom any trust moneys or securities may be deposited, or for any mistake of law or of fact or for any loss arising from any other cause happening without his own wilful default."

The plaintiffs assert, however, that this clause does not, as a matter of law, confer protection or immunity against liability with respect to breaches of trust

resulting from acts of the trustees which exceed or transcend their powers as limited by the trust instrument. This court has already determined that the trustees did exceed their powers as limited by the trust instrument and thus committed a breach of trust. The court is now concerned with the manner and the circumstances under which this breach of trust was committed in order to determine whether the exoneration clause confers immunity from liability to them. And, in that regard, the plaintiffs contend that the breach was committed with reckless indifference to the interest of the beneficiaries.

■ Under the facts and circumstances of this case, this Court is of the opinion that the trustees acted in such a manner that the exoneration clause does confer upon them immunity from liability with respect to the breach of trust committed by them.

■ Although such clauses are construed strictly, they are consistently applied by the courts in the absence of bad faith or profit realized. See Scott on Trusts, Section 222. Concerning exoneration clauses, the Restatement of Trusts, Section 222 provides:

"(1) Except as stated in subsections (2) and (3), the trustee, by provisions in the terms of the trust, can be relieved of liability for breach of trust.

"(2) A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary, or of liability for any profit which the trustee has derived from a breach of trust.

"(3) To the extent to which a provision relieving the trustee of liability for breaches of trust is inserted in the trust instrument as the result of an abuse by the trustee of a fiduciary or confidential relationship to the settlor, such provision is ineffective."

None of these exceptions is applicable to the instant case. No one profited as a result of the payment of interest to the bondholders, other than the bondholders to whom the money was owed; and, there was no evidence that the exculpatory clause was inserted as a result of any over-reaching on the part of the trustees.

With respect to the exception relating to the breach of trust committed intentionally or with reckless indifference to the interest of the beneficiaries, which is the only exception on which the plaintiffs rely, this court is of the opinion that the trustees acted at all times in absolute good faith and committed no wilful default. The funds were applied for what they considered a proper purpose. Considering that the application of the funds had the approval of their attorneys, the attorneys for the Bank, the Judge of the Probate Court, and the acquiescence of the beneficiaries themselves, it would be ridiculous and absurd to conclude that the breach of trust was committed intentionally or with reckless indifference to the interest of the beneficiaries. At most, the trustees made a mistake of law on a point so unusual that the Maine Supreme Judicial Court stated: "The * * issue is so clearly one of (a) novel impression that no counsel has been able to cite a decided case in any jurisdiction, or any legal text, which has a direct bearing on it." Thaxter v. Canal National Bank, 144 Me. 176, 183, 67 A.2d 21, 24. Since the clause expressly exempts the trustees from liability for "mistake of law" arising "without wilful default," it is a complete bar to the action of the plaintiffs against these defendant trustees.

The plaintiffs also seek to impose liability on the Bank as a constructive trustee of the moneys deposited with it by the trustees for the purpose of paying coupons attached to the bonds and disbursed by it in the usual manner for that purpose. They contend that the Bank participated in the breach of trust with the trustees because it had actual knowledge or notice that the moneys received from them and paid over to the bond-

holders were rents of the Clapp Memorial Building, and that it had actual knowledge or notice of the provisions of the trust. The plaintiffs conclude, therefore, that the Bank had actual knowledge or notice of the breach of trust committed by the trustees.

The Bank denies it is liable to the plaintiffs as a constructive trustee, contending that it served merely as a conduit for the payment of the coupons, having received no personal profit from the transaction and having acted in entire good faith and in the exercise of due care under all of the circumstances. It also asserts three affirmative defenses: (1) *Laches*—the plaintiffs having delayed enforcement of their alleged claim against the Bank for so long a time and under such circumstances that enforcement of their claim now would be inequitable; (2) *Res judicata*—the allowance of the accounts of the trustees, which include the wrongful payments, after due notice, was in all respects binding upon the plaintiffs; and (3) *benefit of the exculpatory clause* as agent for the trustees; or *payment* as agent of the bondholders, having disbursed the funds in payment of coupons in good faith and prior to receiving any notice of the claims of the plaintiffs.

The plaintiffs, having alleged in their complaint as the sole ground of recovery against the Bank that it is liable to them as a constructive trustee, must first establish that allegation, for otherwise their action fails at the outset and it will not be necessary to consider the affirmative defenses raised by the answer.

A depository of trust funds is liable to the beneficiaries as a constructive trustee only if some one of the following four circumstances exists: (1) it still has the trust funds or part of them in its hands when it receives notice of the breach of trust; (2) it has received for its own account part or all of the deposited trust funds, or otherwise acquired an advantage from the diversion; (3) it acts with actual knowledge that a breach of trust is being committed; and (4) though ignorant that a breach of trust is being committed, it acts with a negligence so great as to amount to bad faith and dishonesty. See Atlanta & St. A. B. R. Co. v. Barnes, 5 Cir., 1938, 95 F.2d 273.

It should be further emphasized that nearly all the cases in which the degree of responsibility of banks for the disposition of trust funds have been considered have been cases involving outright fraud and embezzlement on the part of the fiduciary for whom the Bank acted. As stated before, nothing in that respect is present in the instant case.

The first two rules are based on ordinary principles of recovery to prevent *unjust enrichment;* the constructive trustee is required to give up merely what it gained by the breach of trust. The third and fourth rules are based upon the entirely different principle that the depository has been guilty of wrongdoing for which it should be *punished* by being required to make the injured beneficiaries whole, even though the depository holds no trust funds nor has been in any way enriched by the breach of trust. See Atlanta & St. A. B. R. Co. v. Barnes, 5 Cir., 1938, 95 F.2d 273, 275.

The issue, insofar as this phase of the case is concerned, is quickly narrowed by considering the aforementioned rules in sequence. At the time the Bank received notice of the breach of trust, it had in its hands only the trifling sum of $9.31 of the moneys deposited with it for the payment of coupon interest. It owned none of the bonds either in its own right or as trustee for any trust administered by it, and received for its services as coupon-paying agent only the nominal standardized fee for corporate fiduciaries. There is, therefore, no basis for applying the principles of unjust enrichment. Unquestionably, the Bank did not have actual knowledge that a breach of trust was being committed. Consequently, the issue as to the liability of the Bank is confined to whether or not, under all of the circumstances of the case, the Bank acted with negligence so great as to amount to bad faith and dishonesty.

██ The circumstances under which a depository *ought to know* that a trustee is committing a breach of trust varies, depending upon the financial interest of the depository in the transaction. Scott on Trusts, Section 324, p. 1738–39. Although,it is true that it may derive a financial benefit from the receiving of the deposit, its financial interest is quite different from that of one who is purchasing trust property or receiving it as security for an indebtedness. A depository of trust funds, therefore, has not the same duty of inquiry as to the authority of the trustee in making a deposit of trust funds or in subsequently withdrawing them. Scott on Trusts, supra.

██ In the case at bar, as the facts clearly indicate, the Bank had no financial interest in the transaction relative to the receipt and disbursement of the moneys of the Clapp estate. It merely acted as a conduit to transmit the moneys from the trustees to the bondholders for which it received nominal compensation. Therefore, in the absence of circumstances giving the Bank grounds for suspecting that the trustees were committing a breach of trust in paying the coupons, it was not bound to inquire whether or not the trustees were committing such breach.

The case of City of Newburyport v. First National Bank of Boston, 1914, 216 Mass. 304, 103 N.E. 782, is directly in point and should be reviewed in conjunction with the earlier case of Brown v. City of Newburyport, 1911, 209 Mass. 259, 95 N.E. 504, 506.

As appears in the Brown case, the Treasurer of the City of Newburyport had been authorized by vote of the City Council to issue notes from time to time when approved by its Finance Committee. The Finance Committee voted that " 'the Mayor, be authorized to approve' " notes in its stead. Notes were issued, and recited upon the face of each note were the complete vote of the City Council, and the vote of the Finance Committee purporting to delegate their authority to the Mayor. The notes were payable at the First National Bank of Boston.

In the first case, Brown, owner of one of the notes, sued the City on his note; and the Supreme Judicial Court of Massachusetts held the note void on · the familiar ground that the Finance Committee, to which the City Council had entrusted the duty of approving such notes, could not in turn delegate to the Mayor the discretion thus imposed upon it, and ordered judgment for the defendant City.

In the companion case above referred to, another of the notes in the amount of $80,000 and identical in form with that sued upon by Brown, had been presented at the office of the First National Bank, to whom Felker (the City Treasurer) had prior to the maturity of the note transferred enough of the City's funds to pay the note. See Brown v. First National Bank, 216 Mass. 298, 299, 103 N.E. 780. The First National Bank had paid the $80,000 in accordance with Felker's instructions to the holder of the note upon presentation. After the decision in the Brown case, the City of Newburyport sued the First National Bank of Boston on the ground that it had no right to pay out the City's funds so transferred to it for the purpose of discharging this note, which as previously held in the Brown case was unenforceable on its face as a matter of law. The Supreme Court of Massachusetts held the Bank not liable and said at pages 304 and 305 of 216 Mass., at page 783 of 103 N.E.:

"The plaintiff's argument in effect is that when municipal or other public securities are made payable at a bank, that bank in paying them is put on inquiry as to their validity by the same facts that put an intended purchaser of them on inquiry.

"The contention is without foundation. A banker having no interest in the matter, who pays out money on deposit on the fraudulent order of the person who by the terms of the deposit had the right to draw on the account, is liable only when he

is privy to the depositor's fraud. It was so held in Allen v. Puritan Trust Co., 211 Mass. 409, 97 N.E. 916, L. R.A.1915C, 518, following Gray v. Johnson, L.R. 3 H.L. 1.  *  *  *

"We are of opinion that the same rule applies in case of an order given by the treasurer of a city to pay what purports to be a note of the city. In the case at bar the defendant had no pecuniary interest in the payment complained of. To make it liable to the plaintiff for damages suffered by the plaintiff because of its having followed the order of the plaintiff's treasurer to pay the note, the burden is on the plaintiff to prove the fact that the defendant bank was privy to Felker's (the City Treasurer's) fraud. The only way in which the plaintiff has undertaken to make out that fact is by pointing out that it was held in Brown v. [City of] Newburyport [209 Mass. 259, 95 N. E. 504], that a purchaser of a city note under these circumstances is put on inquiry. Under these circumstances a purchaser is put on inquiry because he has a pecuniary interest in the matter as one who intends to buy the note. A buyer of an obligation to be paid by taxes levied on the public is charged with inquirying whether the laws which authorize the borrowing of money to be paid for by taxes levied on the public have been complied with. As we already have said, the defendant bank had no pecuniary interest in the payment of the note, and for that reason was not on the same footing as a purchaser of it in the matter of making inquiry.

"In the case at bar the defendant was not in fact privy to Felker's fraud; having no pecuniary interest in the matter it was not put on inquiry as to the validity of the note; and under the decision in Allen v. Puritan Trust Co., supra, as to the checks paid by it in which it had no pecuniary interest, it is not liable."

The plaintiffs' position in the First National Bank case was much stronger than is that of the plaintiffs in the case at bar. There, on the face of the document which was presented to the First National Bank of Boston for payment (which was identical with other notes in a substantial amount handled by the Bank) appeared everything that the Bank needed to know to show that the note was defective because of the well-recognized principle that discretion, which in that instance had been reposed with the Finance Committee, could not in turn be delegated by the Finance Committee to the Mayor. Nevertheless, the bank was absolved of any liability because, lacking pecuniary interest, it was not obliged to inquire as to the validity of the transaction.

In the case at bar, the reason why the the utilization of the income from the Clapp Memorial Building to pay the coupons on the bonds issued to build that building was illegal depended (1) on a factual situation which could only be determined by a close analysis of the several accounts of the trustees which would have shown that in *previous* years a portion of the money used to pay coupons on the bonds had come from the income of the Clapp Memorial Building, (2) a willingness to disregard the legal opinions of many prominent attorneys and judges of the State of Maine—all who had to its knowledge considered the matter, and (3) an ability to foretell which way the Maine Supreme Court would rule upon an issue, which as that Court stated "is so clearly one of novel impression that no counsel has been able to cite a decided case in any jurisdiction, or any legal text, which has a direct bearing on it." See Thaxter v. The Canal National Bank, 144 Me. 176, 183, 67 A.2d 21, 24.

██ Under all of the facts and circumstances of this case, this Court is of the opinion that the Bank acted in entire good faith and without negligence in receiving and disbursing the trust funds as aforesaid. Having accepted the position

of trustee and paying agent of the coupons under the 1922 mortgage indenture, after having received the opinion of Mr. Linnell; having executed the extension agreement of 1937, after having received the opinion of Mr. Nulty; not having had its attention called by either of such legal opinions, or otherwise, to any distinction between general trust income and income from the Clapp Memorial Building; and, knowing that the accounts of the trustees had been signed by trustee Thaxter and by the other trustee, who was one of the income beneficiaries, and had been allowed by Judge Chaplin, the Bank did not, in view of the foregoing and all other facts and circumstances which it knew or ought to have known, act negligently or in bad faith in accepting deposits from the trustees for the payment of coupons and in paying the coupons out of the deposits made with it for that purpose by the trustees.

Therefore, in the opinion of this Court, the plaintiffs have failed to sustain their burden of proof with respect to any fraudulent intent or any negligence so great as to amount to bad faith or dishonesty on the part of the Bank. They failed to prove a crucial element of their case—namely, that the Bank had notice of the breach of trust. Consequently, there is no basis whatsoever upon which to declare the Bank as a constructive trustee for the benefit of the plaintiffs.

In view of the aforementioned conclusion reached by this Court in regard to the trustees and the Bank, it is unnecessary to consider any of the affirmative defenses raised by these defendants, except that the defense of laches may be briefly mentioned because it is so particularly and properly available to them. The plaintiffs were in full possession of all of the material facts; they knew for many years the manner in which the income from the Clapp Memorial Building was being applied; they admitted frankly that neither the trustees nor the Bank, at any time, made misstatements of fact to them or were guilty of concealing anything concerning the administration of this trust from them; they did not even intimate that the trustees and Bank were guilty of any wrongdoing or that these defendants perpetrated a fraud upon them; that, without any satisfactory explanation, valid or otherwise, the plaintiffs delayed for well over ten years to notify the trustees and Bank of their claim which is the basis of this suit; and, because of the plaintiffs' long-continued and unexplained inaction, the trustees and Bank materially changed their position to their detriment. Actually a reference to the following citations will indicate that the case at bar contains almost every typical factual situation recognized by the authorities as sustaining the defense of laches. Restatement of Trusts, Sec. 219; Scott on Trusts, Sec. 219; Kelley v. Brotherhood of Railroad Trainmen, 148 Me. 95, 90 A.2d 717; Leathers v. Stewart, 108 Me. 96, 79 A. 16. Therefore, under these and all other facts and circumstances of this case and in view of the authorities cited herein, it is apparent to this Court that the plaintiffs sat idly by, delaying enforcement of their claim against these defendants for so long a time that its enforcement now would be inequitable.

In view of the findings of fact and conclusions of law of this case, the Court finds for all the defendants in the above-entitled matter and directs that the Clerk of this Court make the following entry therein:

"Judgment for the defendants, with costs."