**Ralf SIEGEMUND, Special Administrator for the Estate of Joan L. Siegemund, et al., Plaintiffs**

v.

**Peter SHAPLAND, et al., Defendants**

No. CIV.01–277–P–H.

United States District Court,
D. Maine.

June 14, 2004.

Thomas F. Hallett, Portland, ME, for Ralph Siegemund, Special Administrator for the Estate of Joan L. Siegemund, Ralf Siegemund, plaintiffs.

John S. Whitman, Richardson, Whitman, Large & Badger, Portland, ME, for Peter Shapland, Peabody & Arnold LLP, defendants.

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HORNBY, District Judge.

This lawsuit arises out of a daughter's unhappiness with her aged mother's care. During her mother's last years, the daughter mounted legal challenges to the actions of her mother's guardians, personal and property. After her mother's death, the daughter sued the personal representative of her mother's estate and both guardians for money damages. During the lawsuit, the daughter died. Her husband, personal representative of her estate, has been substituted as party plaintiff. I have earlier granted summary judgment to both guardians. I now conclude that several of the daughter's claims against the personal representative (negligent and intentional infliction of emotional distress; conspiracy; violations of the Massachusetts Consumer Protection Act and the Maine Unfair Trade Practices Act; and liability for failure to sue the guardian of the mother's person) are also foreclosed by summary judgment. For the one that could proceed to trial (a claim that the personal representative should have sued the guardian of her mother's property), the daughter's estate has no economic interest in the outcome because of the nature of her mother's estate plan. Unless a person with standing is joined as plaintiff within 45 days, I will grant summary judgment to the personal representative on all the plaintiff's claims. However, I deny summary judgment to the personal representative on his counterclaim that the daughter is obliged to indemnify him.

### I. FACTUAL AND PROCEDURAL BACKGROUND

I recite the facts in the light most favorable to the plaintiff, the nonmoving party. Dr. Rose Winston, a neurologist, was diagnosed with dementia at age 83. Massachusetts' Suffolk County Probate Court determined that Dr. Winston was incapable of caring for herself or her property and appointed Winston's daughters, Joan

Siegemund and Diane Crocker, along with an attorney, John Thornton, as Winston's temporary guardians. Pls.' Resp. to Defs. Shapland and Peabody & Arnold's Statement of Undisputed Material Facts ("Pls.' Resp. SMF") ¶ 4 (Docket Item 138). In November of 1987, the Suffolk County Probate Court replaced Siegemund and Crocker with Ira Nagel as guardian of Winston's person. Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. of Defs. Peter Shapland and Peabody & Arnold ("Defs.' SMF") ¶ 4 (Docket Item 117). In February of 1988, the court replaced John Thornton with Stephen Howe as guardian of Winston's property. Defs.' SMF ¶ 9(b).

Joan Siegemund and her sister had a strained relationship. Siegemund believed that her sister was abusing and conspiring to murder their mother. *Id.* ¶ 14. Joan Siegemund also believed that the medical personnel Nagel hired were abusive and were improperly restraining and medicating Winston, and that Howe was mismanaging and squandering Winston's property. She therefore challenged the guardians' activities in the probate courts of both Maine and Massachusetts. According to Joan Siegemund's husband, Ralf Siegemund, Joan became distressed by and obsessed with the guardians' conduct. Pls.' Resp. SMF ¶ 37.

*(A) Actions by the Guardian of Winston's Property*

Winston's property included an apartment building on Commonwealth Avenue and four rooming houses on Hereford Street ("the Hereford Street properties") in Boston. From 1977 to 1987, Winston leased the Hereford Street properties to Charles Patsos or an entity controlled by him, which in turn leased the units to tenants. At the time that Howe was appointed as guardian, many of the rental units in the Hereford Street properties were rent-controlled under the Boston Rent Equity Board. Defs.' SMF ¶ 9; Pls.' Resp. SMF ¶ 9.

Howe had no experience managing real estate. Pls.' Add'l Statement of Material Facts ("Pls.' Add'l SMF") ¶ 58 (Docket Item 138). When he was appointed guardian, Winston's properties were in a state of disrepair. Pls.' Add'l SMF ¶ 52. Thornton told Howe that Patsos was renting units at the Hereford Street properties at rents higher than permitted by rent control. Pls.' Add'l SMF ¶ 59. In December of 1988, a fire damaged one of the rooming houses. Defs.' SMF ¶ 9(d). During 1988, Patsos offered to purchase the Hereford Street properties for $2.2 million and he and Howe entered into a purchase and sale agreement. Howe petitioned the Probate Court to approve the sale, but Diane Crocker and Joan Siegemund objected. Howe withdrew his petition and, on January 1, 1989, he entered into a five-year lease with Charles Patsos and his company, Hereford Corporation, for the Hereford Street properties. The Suffolk County Probate Court approved the lease. Defs.' SMF ¶ 9(c).

During the late 1980s and early 1990s there was a real estate "crash" that caused values to decline in certain sectors of the Boston real estate market. Defs.' SMF ¶ 24; Pls.' Resp. SMF ¶ 24. In March of 1989, Patsos and Hereford Corporation stopped paying rent. Howe did not institute eviction proceedings until 17 months later, in September of 1990. Pls.' Resp. SMF ¶ 9(d). In the fall of 1990 and spring of 1991, the Boston Rent Equity Board held hearings regarding possible rent control violations at the Hereford Street properties. The Board ultimately found several rent control violations and reduced all of the Hereford Street property rents to zero. Pls.' Add'l SMF ¶ 81. One of the

rent control violations led to a housing court case and judgment against Rose Winston's estate for an amount that the record does not reveal. *Id.* ¶ 83 (Shapland Dep. at 37–40).

In the fall of 1991, Howe began soliciting buyers for the Hereford Street properties. In December 1991, he sought the Probate Court's permission to sell the properties for $910,000. Pls.' Resp. SMF ¶ 9(e). The court issued a decree authorizing Howe to conduct a public auction and to sell the properties for not less than $910,000. There were no bidders at the auction, but a buyer offered to buy the Hereford Street properties for $1,020,000. The Probate Court approved the sale to this buyer and the sale closed in July of 1992. *Id.*

### (B) Actions by the Guardian of Winston's Person

After he was appointed guardian of Winston's person, Nagel hired a group of nurses aides to care for Winston in her Boston apartment. According to Joan Siegemund's daughter, Karen Siegemund, the nurses aides did not permit Winston to get out of her wheelchair. Winston told Karen Siegemund that she hated being cared for by them. Pls.' Add'l SMF ¶ 103.[1] In December, 1989, Nagel hired Audrey Pitman, the daughter of one of Howe's clients, to care for Winston full time. Pitman had no medical training and limited experience in elder care. Def.'s SMF ¶ 31. In May of 1990, Winston moved with Pitman to Machias, Maine. In February, 1993, Winston suffered a stroke. Winston died on March 18, 1993.

### (C) Actions of the Personal Representative

Under the terms of Winston's Will, Joan Siegemund and Diane Crocker inherited Winston's personal property and the apartment building at 133 Commonwealth Avenue. Defs.' SMF ¶ 6. The Will directed the residue of Winston's estate into a trust. Under the terms of the trust, upon Winston's death the assets were equally divided into separate trusts, one for Joan Siegemund and one for Diane Crocker. The terms of the trust gave the trustee discretion to distribute income or principal to Joan Siegemund or Diane Crocker, but Siegemund's and Crocker's children are the ultimate beneficiaries of the trust assets. *Id.* The Will provides that the personal representative of the estate shall not be held liable for acts or omissions unless due to his own "willful default."[2] Maine's Washington County Probate Court appointed Peter Shapland as the personal representative of Dr. Winston's estate on May 7, 1993. Shapland was also appointed as the personal representative in ancillary probate proceedings in Boston, Massachusetts.

1. The plaintiff's statement of material fact, paragraph 103, states that when Karen Siegemund visited Winston, "she observed nurses aides push Rose down when Rose tried to stand so Rose couldn't. Karen saw Rose weeping, Rose told Karen how she hated her caregivers." Pls.' Add'l SMF ¶ 103. Karen Siegemund's deposition testimony supports this paragraph. Shapland's motion to strike paragraph 103 is therefore **DENIED**. (Docket Item 156.)

2. Siegemund argues that I should not consider the exculpatory clause because Shapland does not refer to the clause in his Statement of Material Facts. Pls.' Opp'n to Defs. Shapland and Peabody & Arnold's Mot. for Summ. J. ("Pls.' Opp'n to Mot. for Summ. J.") at 11–12 (Docket Item 136). Rose Winston's Will is, however, a part of the summary judgment record. Defs.' SMF ¶ 6. I decline to ignore it. I deal with the waiver argument later in text. Siegemund has moved to strike certain of Shapland's statements of material fact (Docket Item 135). Because I have not relied upon any of the statements that Siegemund objects to, her motion to strike is **MOOT**.

As personal representative, Shapland filed several objections to Howe's accounts, alleging that Howe's mismanagement of Rose Winston's properties resulted in losses to the estate. Shapland withdrew most of the objections, however. Defs.' SMF ¶¶ 21–27. Shapland refused to file a lawsuit against Nagel for his role in the alleged mistreatment of Winston during her lifetime. According to Ralf Siegemund, Shapland said that he had an agreement not to pursue claims against the guardians. Pls.' Add'l SMF ¶ 82.

### (D) Procedural History of this Case

Joan Siegemund filed a lawsuit against Shapland and his law firm, Peabody & Arnold, LLP, in Maine Superior Court on October 15, 2001. Shapland and his firm removed the suit to federal court. On January 29, 2002, Siegemund joined as party defendants the guardians, Nagel and Howe, and their respective law firms, and amended the complaint to assert various claims against them. Joan Siegemund died on June 19, 2002, and Ralf Siegemund, Joan's husband and Special Administrator of her estate, was substituted for her as the plaintiff.

Shapland, Nagel, Howe, and their respective law firms moved for summary judgment or to dismiss. They argued, in part, that various Probate Court orders approving of the guardians' actions barred Siegemund's[3] claims under the doctrine of claim preclusion or *res judicata*. In a February 24, 2003, order I rejected claim preclusion as a basis of avoiding liability. I dismissed Siegemund's claims against Howe (guardian of Winston's property) and his law firm on the ground that, under Mass. Gen. Laws Ann. Ch. 206 § 22, Howe was exonerated from liability after the Suffolk County Probate Court allowed his final accounting and the time for appeal had passed. Discovery closed on September 29, 2003. Shortly thereafter, Shapland and Nagel again moved for summary judgment. On February 26, 2004, I granted Nagel's (guardian of Winston's person) motion for summary judgment because the statute of limitations barred any action against him or his firm. Personal Representative Shapland and his law firm are therefore the only remaining defendants.

## II. ANALYSIS

The Amended Complaint states claims against Shapland and his law firm[4] for: (1) breach of fiduciary duty and negligence (Counts I, II, & X); (2) negligent infliction of emotional distress (Counts I & II); (3) intentional infliction of emotional distress (Counts I & II); and (4) Conspiracy (Count IX).[5]

The breach of fiduciary duty and negligence claims are predicated on Shapland's decision not to sue Nagel and Howe on behalf of Winston's estate and permitting the statute of limitations to run on the

---

**3.** For simplicity, I refer to the plaintiffs collectively as "Siegemund." I also use feminine pronouns because the lawsuit originated with Joan Siegemund, rather than her husband, Ralf Siegemund.

**4.** The Amended Complaint does not make any independent claims against the law firm. Therefore, for the sake of simplicity, I refer to the moving parties as "Shapland."

**5.** In Counts III and VII, Siegemund alleges that the defendants violated the Massachu-

setts Consumer Protection Act and the Maine Unfair Trade Practices Act. Siegemund admits that she did not comply with the statutory notice requirements. In her opposition memorandum, Siegemund acknowledges "that the failure to provide written notice prior to suit is fatal to [her] claim against Shapland for Shapland's unfair trade practices conduct." Pls.' Opp'n to Mot. for Summ. J. at 49. Accordingly, Shapland is entitled to summary judgment on Counts III and VII.

claims against the guardians.[6] The negligent and intentional infliction of emotional distress claims allege that Shapland caused Joan Siegemund emotional distress by refusing to sue the guardians and by withholding information about the conduct of Winston's guardians. The conspiracy claim alleges that Shapland, Nagel and Howe were involved in a conspiracy that involved, in part, an agreement that Shapland would not sue the guardians. Shapland has moved for summary judgment on all counts.

### (A) Negligence/Breach of Fiduciary Duty

#### (1) Exculpatory Clause

Rose Winston's Will contains a so-called "exculpatory clause," providing that "no executor shall be liable for his acts or omissions" unless "due to his own willful default." Shapland argues that he cannot be liable for breach of fiduciary duty or negligence because his decisions not to sue the guardians do not rise to the level of "willful default." Siegemund argues that the exculpatory clause is an affirmative defense that Shapland failed to plead and therefore waived.

■ Under Fed.R.Civ.P. 8(c), certain enumerated defenses and "any other matter constituting an avoidance or affirmative defense" must be pleaded affirmatively. Defenses fall within Rule 8(c)'s residuary clause if they amount to a "bar to the right of recovery even if the general complaint were more or less admitted to." *E.g., Jakobsen v. Mass. Port Authority,* 520 F.2d 810, 813 (1st Cir. 1975).

■ An exculpatory clause is not among the defenses listed in Rule 8(c). The question, then, is whether the exculpatory clause falls within Rule 8(c)'s residuary clause. The parties have not cited, and I have not found, any caselaw discussing whether an exculpatory clause like the one in Winston's Will constitutes an affirmative defense.[7] However, the exculpatory clause limits the liability of the personal representative to breaches of duty that constitute "willful default" and essentially bars recovery for negligence. The clause is not, as Shapland argues, simply a refinement of the applicable standard of care; it is a limitation on the personal representative's liability. I conclude that the exculpatory clause in Rose Winston's Will is an affirmative defense or "avoidance" that Fed. R.Civ.P. 8(c) requires be raised affirmatively. *See Williams v. The Gradall Co.,* 990 F.Supp. 442, 446 (E.D.Va.1998) ("A warranty disclaimer is an affirmative defense.").

■ On December 12, 2003, Shapland moved for leave to amend his answer pursuant to Rule 15(a) to add the exculpatory clause as an affirmative defense. (Docket

---

6. In Count X, Siegemund alleges that Shapland breached his fiduciary duty by allowing the statute of limitations to run on the claims against Nagel and Howe. I see no practical difference between failing to sue and letting the statute of limitations run on a claim that one has an obligation to bring. The two theories involve the same proof and give rise to the same damages. The parties do not deal with the statute of limitations issue separately from the failure to sue issue, which is raised in Counts I and II. Accordingly, I do not give Count X separate treatment in this decision.

7. Siegemund cites *Newhouse v. Canal National Bank,* 124 F.Supp. 239 (D.Me.1954), for the proposition that an exculpatory clause is an affirmative defense. However, that case merely recognized that the trustees had pleaded the exculpatory clause as an affirmative defense; the case did not discuss whether the trustees were required to do so under Rule 8(c).

Item 157). Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." The rule is liberal, *Maddalone v. Shosen*, 756 F.2d 886, 887 (1st Cir.1985), and courts may not "deny an amendment solely because of delay and without consideration of the prejudice to the opposing party." *Hayes v. New England Millwork Dist., Inc.*, 602 F.2d 15, 19 (1st Cir.1979). When "considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some valid reason for his neglect and delay." *Grant v. News Group*, 55 F.3d 1, 6 (1st Cir.1995). " 'Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself, to disallow an amendment of a pleading.' " *Carmona v. Toledo*, 215 F.3d 124, 136 (1st Cir.2000) quoting *Tefft v. Seward*, 689 F.2d 637, 639 n. 2 (6th Cir.1982).

■ Shapland filed his Amended Answer on March, 13, 2002, and filed this motion to amend on December 12, 2003. The delay is considerable. Siegemund argues that Shapland has failed to provide any reason to justify his failure to plead the exculpatory clause defense until so late in the lawsuit. Shapland has, however, given a reason. According to Shapland, he did not plead the exculpatory clause sooner because he did not, and still does not, consider the clause to be an affirmative defense. Although I have concluded that the exculpatory clause *is* an affirmative defense that Rule 8(c) requires be pleaded affirmatively, there was no guidance in the caselaw. In the absence of any controlling law, Shapland would have been wise to plead the defense affirmatively. Standing

alone and in light of Rule 15(a)'s liberality, however, Shapland's lack of caution does not warrant denial of his motion to amend without considering prejudice.

Siegemund says that she would be prejudiced if Shapland is permitted to amend now because discovery is complete and because she has "proceeded with this case based on the other defenses raised." Pls.' Opp'n to Shapland Defs.' Mot. for Leave to Amend Answer ("Pls.' Opp'n to Mot. to Amend") at 7 (Docket Item 172). Siegemund points to the time and energy that she has already devoted to the case and argues that, if the amendment is allowed, "[a]dditional issues will have to be examined and litigated, including re-opened discovery, and new expert designation and testimony." *Id.* at 5. Siegemund does not identify, however, what "additional issues" the exculpatory clause defense raises or explain why permitting the defense would unreasonably delay trial. The exculpatory clause defense does not change the facts of the case, only the standard by which the personal representative's conduct is evaluated. Thus, the time and energy that Siegemund has spent preparing this case would not be wasted if I permit the amendment. Had the exculpatory clause been raised earlier, Siegemund presumably would have sought expert testimony on whether Shapland's conduct constituted willful default. If I allow amendment, Siegemund will be prejudiced by not having this testimony. I could alleviate the prejudice, however, by reopening discovery and permitting Siegemund to obtain an additional opinion from True or seek another expert.[8] I could further protect

---

8. Of course, if Siegemund is unable to procure expert testimony on the new standard of care, she will suffer "prejudice" if she is thereby unable to prove Shapland's liability. In that event, Siegemund would be prejudiced to the extent that she spent time and money

on a claim without legal merit. *See Estes v. Kentucky Utilities Co.*, 636 F.2d 1131, 1134 (6th Cir.1980). Siegemund does not argue, however, that her cause of action for breach of fiduciary duty will be abrogated by the exculpatory clause defense, only that the new

Siegemund from prejudice by conditioning amendment upon Shapland bearing the reasonable costs of this additional discovery. Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1486, pp. 605–606 (2d. ed. 1990) ("If the party opposing the amendment can be protected by the use of conditions from any possible prejudice that might result from the untimeliness of the amendment, there is no justifiable reason for not allowing it."). Aside from needing expert testimony on the new standard of care, Siegemund has not shown how her case preparation is affected by my allowing Shapland to amend. The scope of necessary additional discovery is narrow and, if I condition amendment upon Shapland bearing reasonable costs, the burden on Siegemund slight.

Siegemund claims that she had no notice of Shapland's intent to raise the exculpatory clause and that Shapland "chose to lie in wait . . . preparing to spring the 'exculpatory clause' defense for the first time at Summary Judgment." Pls.' Opp'n to Mot. to Amend at 4. Although Siegemund may not have known that Shapland intended to rely upon the exculpatory clause defense, she was certainly on notice that the clause existed. The exculpatory clause is contained in Rose Winston's Will, a critical

document in a lawsuit against a personal representative.[9] And there is nothing in the record to suggest that Shapland chose to "spring" this defense and surprise Siegemund on the eve of trial. Instead, it appears that both parties overlooked the clause.

Rule 15(a) permits amendment "when justice so requires." In this case both parties had access to the Will; and the Will's crucial role in this lawsuit, against a personal representative, should have been obvious.[10] There is no suggestion that Shapland's delay was motivated by bad faith, and any prejudice caused by the delay can be alleviated by reopening discovery for Siegemund's benefit. If I do not permit Shapland to amend, this case will proceed based upon an inapplicable standard of care and the personal representative will lose the benefit of the limited liability that Winston's Will bestows upon him. Justice requires that Shapland be permitted to amend his Amended Answer. The motion to amend the Amended Answer to add the exculpatory clause defense is GRANTED on the condition that the defendant pay reasonable fees and costs associated with further discovery. I authorize an additional 60 days of discovery and direct the parties to consult with the Magistrate Judge if they need more time.[11]

---

defense will require her to expend additional time and money.

9. Siegemund was made aware of the exculpatory clause a few days before discovery closed at the deposition of Attorney Martha Gaythwaite, one of Shapland's expert witnesses. When Siegemund's lawyer asked Gaythwaite at her deposition whether she believed that Shapland's investigation of the guardians' conduct was adequate, Gaythwaite responded that his investigation clearly passed the "willful default standard in the actual will."

Siegemund's Motion to Exclude Portions of the Expert Testimony of Martha Gaythwaite is DENIED. (Docket Item 112). As a litigation expert, Gaythwaite is qualified to express her

opinion on whether lawsuits against the guardians would have been successful and is entitled to consider all of the factors that bear on likelihood of success.

10. If this case progresses to trial, presumably the jury will see the Will. If I do not grant Shapland leave to amend, the parties will either have to redact the exculpatory clause or I will have to instruct the jury to ignore it, presenting the jury a distorted view of the document.

11. Shapland filed a motion to exclude the testimony of one of plaintiff's experts, Calvin True, on the ground that True's opinion did not address the relevant standard of care set

### (2) The Elements

Maine law applies to the activities of a Maine-appointed personal representative for a Maine decedent. Under Maine law, a "personal representative is under a duty to settle and distribute the estate of the decedent ... as expeditiously and efficiently as is consistent with the best interests of the estate." 18–A M.R.S.A. § 3–703. "[T]he duties of an executor ... encompass the obligation to fully enlighten oneself without delay by investigation or otherwise as to what needs to be done in the discharge of the office .... The executor must always bear in mind that the estate must be preserved for distribution to the beneficiaries." *Estate of Tessier*, 468 A.2d 590, 594 (Me.1983). "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." *Bryan R. v. Watchtower Bible & Tract Soc'y, Inc.*, 1999 ME 144, ¶ 15, 738 A.2d 839, 845 (quoting Restatement (Second) of Torts § 847).

Rose Winston's Will provides that "[u]nless due to his own willful default, no executor shall be liable for his acts or omissions." The exculpatory clause in the Will therefore alters the standard of care; in order to be liable, Shapland must have committed "willful default." [12] At trial, Siegemund will bear the burden of proving each element of her cause of action: willful default, causation, and damages.[13] Shapland argues that on the summary judgment record Siegemund has failed to demonstrate any of the elements of her case.

### (a) Willful Default

In Maine, the general rule is that "a will is interpreted according to the laws of the ... state of domicil of the testator, since he is supposed to have been conversant with those laws." *E.g., Chapman v. Chapman*, 577 A.2d 775, 776 (Me.1990). This general rule assumes that the testator is most familiar with the laws of the state of domicil immediately prior to death. In *Houghton v. Hughes*, 108 Me. 233, 236, 79 A. 909 (1911), the Law Court favorably cited a Massachusetts case, *Lincoln v. Aldrich*, 149 Mass. 368, 373, 21 N.E. 671 (1889). In *Lincoln*, the court held that Massachusetts law applied to the will of a testator who lived most of her life and drafted her will in Massachusetts, but resided in New Hampshire at the time of her death, because the testator would have been familiar with Massachusetts law. *Lincoln*, 149 Mass. at 373, 21 N.E. 671.

forth in the exculpatory clause in Winston's Will. (Docket Item 114). The motion is GRANTED WITHOUT PREJUDICE to Siegemund's obtaining additional expert testimony as permitted in text.

12. Aside from her waiver argument, Siegemund does not challenge the enforceability of the exculpatory clause. Since the relevant standard of care in this case is "willful default," not negligence, Shapland is entitled to summary judgment on Siegemund's negligence claims.

13. Siegemund repeatedly argues that her only burden is to establish the existence of a fiduciary duty, and that once she establishes duty, the burden shifts to Shapland to establish that he did *not* breach that duty. *See, e.g.*, Pls.'

Opp'n to Mot. for Summ. J. at 18. The cases that Siegemund cites for this proposition, however, are all self-dealing and undue influence cases. *E.g., DesMarais v. Desjardins*, 664 A.2d 840, 843–44 (Me.1995). In *DesMarais*, an undue influence case, the court held that the burden shifts because "[t]he law imposes a presumption of undue influence on the part of the superior party in a confidential relationship if the superior party obtains a benefit from a transaction between the parties." Siegemund alleges neither undue influence nor that Shapland personally benefited from not suing Nagel and Howe. The cases that Siegemund cites are therefore inapposite. The burden to prove each element of the cause of action remains with her.

Winston was domiciled in Maine when she died, but she lived most of her life in Massachusetts. Moreover, her Will was drafted in Massachusetts by a Massachusetts law firm. Under the circumstances, Winston would likely have been more familiar with, and it is therefore appropriate to consider, Massachusetts law.

■ Massachusetts cases define "willful default" as "intentional," "implying a bad purpose" or an "intent to cause loss." [14] *New England Trust Co. v. Paine,* 317 Mass. 542, 59 N.E.2d 263 (1945). *See also Marsman v. Nasca,* 30 Mass.App.Ct. 789, 573 N.E.2d 1025 (1991); *Newhouse v. Canal National Bank,* 124 F.Supp. 239, 248–49 (D.Me.1954). Shapland argues that Siegemund has not produced any evidence that Shapland's refusal to sue the guardians constituted "willful default."

Ralf Siegemund claimed in his affidavit that, in his presence, "Shapland stated that he was not going to proceed against Nagel or Howe because he had agreed not to." Pls.' Resp. SMF ¶ 19; Ralf Siegemund Aff. ¶ 4.[15] Although Shapland strongly denies having said this (or having any agreement not to pursue the guardians), it is a contested fact. If proven, it can show improper motive or bad faith. Therefore, it raises a genuine issue of material fact whether Shapland's decision not to sue the guardians constituted "willful default" under the provisions of the Will.

### (b) Causation and Damages

If Siegemund establishes that Shapland committed "willful default," Siegemund still must show that Shapland's decision not to sue the guardians caused a loss to the estate. If no reasonable fiduciary would have brought the claims or if the lawsuits ultimately would have been unsuccessful, then Shapland's alleged "willful default" did not cause any loss to the estate.

■ Because Siegemund's breach of fiduciary duty claim is a "failure to sue" claim, it is akin to a claim of legal malpractice. In a legal malpractice case where the plaintiff alleges that the lawyer failed to file or pursue a lawsuit, the plaintiff is required to prove the so-called "case within a case." *See Steeves v. Bernstein, Shur, Sawyer & Nelson,* 1998 ME 210, ¶ 15, 718 A.2d 186, 190–91 ("In an action following an attorney error during trial, the court addressing the causation issue in the subsequent malpractice action merely retries, or tries for the first time, the client's cause of action which the client asserts was lost or compromised by the attorney's negligence.") (internal quotation omitted). *See also* Mallen and Smith, *Legal Malpractice,* § 33.8 (5th ed.2000). To establish that Shapland would have been successful had he sued the guardians, Siegemund will have to prove two internal cases: the case against Nagel and the case against Howe. To prove these internal cases, Siegemund will have to present the evidence that would have been presented had Shapland

---

**14.** There are no Maine cases interpreting "willful default" and the parties do not argue that Maine would ascribe a different meaning to the term.

**15.** Shapland's motions to strike paragraph 4 of Ralf Siegemund's affidavit (Docket Item 155) and paragraph 19 of Siegemund's response statement of material facts (Docket Item 156) are DENIED. Contrary to Shapland's assertions, paragraph 4 of Ralf Siegem-

und's November 21, 2003, affidavit does not contradict Ralf Siegemund's deposition testimony. Ralf Siegemund testified at his deposition that although he did not remember the exact words that Shapland used, Ralf Siegemund heard Shapland say something that Ralf Siegemund interpreted to mean that Shapland had "promised certain people he would not go after them." Ralf Siegemund Dep. 157:2–11; 158:17–22.

sued the guardians. Mallen and Smith, *Legal Malpractice,* § 33.8. Siegemund does not need expert testimony to establish that the internal cases would have been successful; the federal jury will decide whether the two guardians breached their fiduciary duties and, if so, what damages resulted. *See id.* § 33. Nor is expert testimony on that aspect of causation required; in a failure to file case such as this, causation is within the understanding of the jury.[16] *Id.* ("Causation may be obvious if the lawyer's error was an affirmative act or for some omissions, such as the failure to file a lawsuit.").

Siegemund has presented evidence that Nagel's decision to place Winston with Pitman, rather than in an assisted living facility, was not in Winston's best interests. Pls.' Add'l SMF ¶¶ 69–70. Siegemund has also presented evidence that Howe's delay in instituting eviction proceedings against Patsos was unreasonable and resulted in lost rent. Pls.' Add'l SMF ¶ 73. In her "case within a case," these allegations present jury questions about the guardians' liability.

That is not the end of the issue, however. Although this case resembles legal malpractice in that Siegemund will have to prove the "cases within the case," this is a lawsuit not against a lawyer, but against a personal representative. A lawyer's duty runs to his or her client; a personal representative's duty runs to the estate. A personal representative has a duty "to settle and distribute the estate of the decedent . . . as expeditiously and efficiently as is consistent with the best interests of the estate." 18–A M.R.S.A. § 3–703. Thus, unlike a lawyer instructed by a client to file a lawsuit, a personal representative must *decide* whether to file a lawsuit, and the decision involves risk assessment by the personal representative: weighing the likelihood of recovery and the likely size of any award against the time and expense involved. To prove that Shapland's "willful default" caused a loss to the estate, Siegemund must show that, after assessing the likelihood and amount of recovery, the expenses being incurred, and the delay in distribution to the beneficiaries, a reasonable fiduciary would have pursued these claims. Unlike the ultimate issue of the guardians' liability, this decision-making process of a personal representative is outside the understanding of the jury. Ac-

---

16. Shapland cites *Corey v. Norman, Hanson & DeTroy,* 1999 ME 196, ¶¶ 12–14, 742 A.2d 933, 939–41 and *Mitchell v. Jackson,* 627 A.2d 1014 (Me.1993), for the proposition that expert testimony is always required to prove proximate cause in attorney malpractice actions. In *Mitchell,* the Law Court held that expert testimony is required to establish an attorney's breach of duty, unless the matter is within the ordinary experience and knowledge of lay persons. *Mitchell,* 627 A.2d 1014. In *Corey,* the court held that expert testimony was required because the causation issues involved were outside the ordinary experience and knowledge of the jury. 1999 ME ¶ 14, 723 A.2d 870. *Corey,* however, was not about a lawyer's failure to file a lawsuit. In *Corey,* the plaintiff alleged that her attorney failed properly to value certain marital property in her divorce. The court said that, in order to show that the undervaluation caused a loss, the plaintiff had to show that "the court would have accepted the higher value . . . or *that if the court accepted a higher value, it* would have awarded any part of the increase to [plaintiff], or that if it did award a part of the increase to [plaintiff], such increase would not be offset by a less favorable award of alimony." *Id.* By contrast, in the case of an attorney's failure to file a lawsuit, causation is obvious. *See* Mallen and Smith, *Legal Malpractice,* § 33.17. The jury does not need to hear expert testimony in order to conclude that an attorney who negligently fails to file a winning lawsuit has caused a loss. Siegemund still may have to produce expert testimony to the extent necessary to prove the guardians' liability, as distinct from causation. *See Mitchell v. Jackson,* 627 A.2d 1014 (Me.1993).

cordingly, expert testimony on this issue is required.

 Siegemund has designated an expert, Calvin True, to testify about Shapland's fiduciary duty to bring claims on behalf of the estate. In his deposition, True said that a personal representative has a duty to file a lawsuit on behalf of the estate if the suit will more likely than not result in a net monetary gain to the estate. Pls.' Add'l SMF ¶ 69.[17] Relying on the facts alleged in the Amended Complaint, Shapland's objections to Howe's accounts, and Howe's deposition, True said that lawsuits against Howe and Nagel likely *would* have resulted in a net monetary gain to the estate and that Shapland therefore breached his fiduciary duty by failing to pursue those claims. However, True did not express an opinion about litigation expenses, delay, or the size of any award that Shapland would likely have recovered. The foundation for True's opinion that each lawsuit would have conferred value on the estate is therefore unclear.

Particularly unclear is how True reached the conclusion that a lawsuit against Nagel, guardian of Winston's person, would have resulted in a net gain to the estate. True is entitled to rely upon other sources or consider hypotheticals in arriving at his opinion. Fed.R.Evid. 703. But nothing in the record purports to value the lawsuit against Nagel or estimate the damages that Nagel allegedly caused Winston.

True is a trusts and estates attorney, not a litigation attorney. He did not testify to any expertise to evaluate the personal injury or emotional distress claims that he says would have resulted in a net gain to the estate.[18] Rose Winston was 83 years old and suffering from dementia from the day that Nagel was appointed as guardian until the day that she died. The putative claim was for harm that Nagel inflicted upon Winston. Valuing Winston's recovery on this claim would have been difficult. Moreover, pursuing a lawsuit against Nagel would have created expense to the estate (there is nothing in the record suggesting that a lawyer would have taken this case on a contingent fee basis) and delayed distribution under the Will. Without any information regarding damages, any estimate of what a lawsuit against Nagel would recover for the estate, or any information about potential litigation costs, True's opinion that a lawsuit against Nagel would have resulted in a net gain to the estate is speculative, based on insufficient facts, and therefore inadmissible under Fed.R.Evid. 702.[19] Siegemund needs expert testimony to establish that a reasonable and prudent fiduciary would have seen value in a lawsuit against Nagel, and there is no other expert designated to testify on that point. Therefore, Siegemund cannot establish that Shapland's failure to sue Nagel proximately caused a loss to the estate. Shapland is entitled to sum-

---

**17.** Shapland has moved to strike paragraph 69 and several other of Siegemund's statements of material fact on the ground that they summarize expert opinions, not facts. (Docket Item 156). Expert opinion on the issue of liability would be appropriate at trial and may therefore be included in Siegemund's statement of material facts. Shapland's motion to strike these statements is **DENIED**. The remainder of Shapland's motion to strike certain portions of Siegemund's statement of material facts is **MOOT**, as I did not rely upon the other paragraphs that Shapland objects to.

**18.** True acknowledged that when he is serving as a personal representative, he consults with litigation attorneys at his firm before deciding to pursue claims on behalf of the estate.

**19.** Shapland's motion to exclude True's testimony is **GRANTED** insofar as True's testimony relates to the lawsuit against Nagel. (Docket Item 114).

mary judgment on Siegemund's claims that Shapland breached his duty by failing to sue Nagel.[20]

■ True's opinion that a lawsuit against Howe would have conferred value on the estate has more support in the record. Shapland initially objected to Howe's accounts on the ground that Howe's negligence in managing Winston's properties resulted in a loss to the estate. In his Second Supplement to the Statement of Objections to the allowance of Howe's accounts, Shapland said that the Hereford Street properties declined in value by as much as $1.3 million under Howe's watch. In his Statement of Objections, Shapland also estimated that the rent lost due to Patsos' default on the lease was $330,000. Thus, Shapland at one time estimated the damages that Howe caused the estate at over $1.6 million dollars. Given that figure and the allegations set forth in the Amended Complaint, there is support for True's conclusion that a lawsuit against Howe would have conferred value on the estate.[21]

True's opinion thus raises a factual question whether a reasonable fiduciary would have filed the lawsuit against Howe, and there is sufficient evidence from which the jury could find Howe liable for breach of fiduciary duty.[22] Whether Shapland's failure to sue Howe caused a loss to the estate is a jury question.[23] Accordingly, Shap-

20. Siegemund designated Dr. Adler to testify about Nagel's duty of care. Since Shapland is entitled to summary judgment on Siegemund's claim that he should have sued Nagel, Dr. Adler's testimony is irrelevant and Shapland's motion to exclude Dr. Adler's testimony is **MOOT**.

21. Shapland argues that True's opinion should be excluded because True lacks litigation expertise and because he failed to consider the role that the various Probate Court orders would play in a fiduciary's decision whether to sue. True acknowledged at his deposition that, when serving as a personal representative, he usually consults with a litigation attorney in his firm before he decides to pursue a claim on behalf of the estate. He also admitted that he was unaware that the Probate Courts of Massachusetts had approved of certain of Howe's actions. These shortcomings certainly diminish the weight of True's opinion and Shapland is entitled to explore them at trial. Given the loss figures supplied by Shapland, however, True's opinion is adequately supported and admissible. Shapland's motion to exclude True's opinion as it relates to the lawsuit against Howe is **DENIED**.

22. Siegemund claims that Shapland also should have sued the guardians for negligent and intentional infliction of emotional distress, for fraud, and for violating the Massachusetts Consumer Protection and Trade Practices Act, Mass Gen. Laws ch. 93A.

There is no evidence in the summary judgment record that Howe, who was responsible for property management, caused Rose Winston emotional distress. Nor is there any evidence that Howe engaged in fraud or violated the Massachusetts statute. *See Planned Parenthood Federation v. Problem Pregnancy of Worcester*, 398 Mass. 480, 498 N.E.2d 1044, 1051 (1986) (Mass. Gen. Laws ch. 93A applies only to "trade or commerce"); *Steele v. Kelley*, 710 N.E.2d 973, 984–85 (Mass.App. 1999) (ch. 93A does not apply to the "actions of a trustee, executor, or administrator in executing fiduciary responsibilities ...."). To the extent that Siegemund maintains that Shapland should have sued Howe on these theories, Shapland is entitled to summary judgment.

23. Shapland has filed a motion to exclude portions of the testimony of Siegemund's real estate experts, John Kline and John Thornton. (Docket Item 114). At his deposition, Kline testified to what the Hereford Street properties would have been worth in 1992 and beyond had Howe repaired and rented them. Shapland challenges Kline's estimate of what it would have cost to repair the buildings and argues that Kline's opinion as to what the properties would have been worth is speculative. Shapland's arguments are more appropriately directed to the weight, and not the admissibility, of Kline's testimony. The motion to exclude Kline's testimony is **DENIED**. At his deposition, Thornton also estimated what

land's motion for summary judgment on Siegemund's claim that he should have sued Howe is **DENIED**.

### (B) Infliction of Emotional Distress

In both Counts I and II of the Amended Complaint, Siegemund seeks damages for intentional and negligent infliction of emotional distress. Specifically, Siegemund alleges that she suffered "extreme emotional distress" as a result of Shapland's refusal to sue the guardians and his failure "to provide the Plaintiffs with information necessary for the Plaintiffs to determine the nature of Rose Winston's health and care during the years of guardianship." Am. Compl. ¶¶ 70, 72–75.

■ In order to recover for intentional infliction of emotional distress, Siegemund must demonstrate that Shapland intentionally or recklessly inflicted severe emotional distress and that his conduct was so "extreme and outrageous as to exceed all possible bounds of decency." *Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22–23. To give rise to a claim for intentional infliction of emotional distress, Shapland's conduct must "be regarded as atrocious [and] utterly intolerable in a civilized community." *Id.* Refusing to file a lawsuit and/or withholding information simply does not rise to the level of "extreme and outrageous" contemplated by the Maine caselaw. Shapland is entitled to summary

judgment on Siegemund's intentional infliction of emotional distress claim.

■ The Law Court has held that a person has a duty to avoid negligently inflicting emotional harm on others in two situations: (1) so-called bystander liability actions, and (2) where a special relationship exists between the actor and person emotionally harmed.[24] *Id.* ¶ 19. Siegemund's claim fits only the second category. Even in cases where a special relationship exists, however, a party cannot be liable for negligent infliction of emotional distress if the harm is not reasonably foreseeable. *Gammon v. Osteopathic Hospital of Maine*, 534 A.2d 1282, 1285 (Me.1987). "A defendant is bound to foresee psychic harm only when such harm reasonably could be expected to befall the ordinarily sensitive person." *Id.* at n. 8. Moreover, "[t]he plaintiff must suffer serious mental distress, such that 'a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event.'" *Id.* (citation omitted).

■ According to Ralf Siegemund, Joan Siegemund was "greatly distressed when Shapland refused to pursue claims against Howe and Nagel. She neglected caring for herself, and spent all her time focusing on these issues. She was unable to lead a meaningful life. She ignored all her friends, becoming isolated." Defs.' SMF ¶ 80; Ralf Siegemund Aff. ¶¶ 8–9.[25]

the Hereford Street properties would have been worth had Howe properly managed them. Unlike Kline, however, Thornton has no expertise in real estate valuation and has never sold or appraised a property. He admitted as much at his deposition. Thornton is not qualified to offer an opinion on the value of the Hereford Street properties. Shapland's motion to exclude this portion of Thornton's testimony is therefore **GRANTED**.

24. Shapland does not argue, and I therefore do not consider, whether the exculpatory

clause in Winston's Will affects Siegemund's negligent infliction of emotional distress claim.

25. Shapland's motion to strike paragraphs 8 and 9 of Ralf Siegemund's Affidavit is **DENIED**. (Docket Item 155). Paragraphs 8 and 9 of the affidavit supplement, and do not contradict, Ralf Siegemund's deposition testimony. The remainder of Shapland's motion to strike certain paragraphs of Ralf Siegemund's Affidavit is **MOOT**, as I do not rely on the other paragraphs that Shapland objects to.

While tragic, this reaction to Shapland's decision not to sue would not "be expected to befall the ordinarily sensitive person." Siegemund's emotional distress was not a reasonably foreseeable consequence of Shapland's conduct. Summary judgment on the negligent infliction of emotional distress claim is therefore GRANTED.

### (C) Conspiracy

 In Count IX of the Amended Complaint, Siegemund alleges that Shapland, Nagel, and Howe were involved in a conspiracy. Under Maine law, " 'conspiracy' fails as the basis for the imposition of civil liability absent the *actual commission* of some *independently recognized tort;* and when such separate tort has been committed, it is *that tort,* and not the fact of combination, which is the foundation of the civil liability." *Cohen v. Bowdoin,* 288 A.2d 106, 110 (Me.1972) (emphasis in original). Conspiracy itself is not a cause of action under Maine law. Accordingly, Shapland is entitled to summary judgment on Count IX.

### (D) Joan Siegemund's Standing or Capacity

The Amended Complaint in this case was brought on behalf of Joan Siegemund, Joan Siegemund on behalf of the Estate of Rose Winston, and the Estate of Rose Winston. After Joan Siegemund's death in 2002, Ralf Siegemund, Special Administrator of the Estate of Joan Siegemund, was substituted for his late wife. Shapland argues that Joan Siegemund (and therefore Ralf Siegemund as her successor in interest) lacks capacity to sue in the name of Winston's estate. Shapland also argues that Siegemund lacks standing to sue on her own behalf.

 Shapland correctly points out that, under the Maine Probate Code, only the personal representative is authorized to sue on behalf of the estate.[26] Under Maine law, a personal representative has the power to "[p]rosecute or defend claims, or proceedings in any jurisdiction for the protection of the estate ...." 18–A M.R.S.A. § 3–715(22). "[T]o acquire the powers ... of a personal representative of a decedent, a person must be appointed by order of the judge ..." 18–A M.R.S.A. § 3–103. Joan Siegemund was not appointed to represent Rose Winston's estate and so cannot, under Maine law, file suit on its behalf or in its name.[27] Accordingly, (1) Ralf Siegemund, Special Administrator of the Estate of Joan Siegemund, on behalf of the Estate of Rose Winston, and (2) the Estate of Rose Winston are not proper

26. Massachusetts law provides that a beneficiary, such as Joan Siegemund, may bring suit on behalf of the estate if the personal representative refuses to do so "or is unable to do so by reason of his interest or otherwise ...." Mass. Gen. L. ch. 230 § 5. Shapland argues that this provision applies only to lawsuits against third parties, not lawsuits against the personal representative himself. I note that nothing in the text of the statute limits the parties that a beneficiary may sue. Moreover, because a personal representative is unable to sue himself "by reason of his interest," lawsuits against a personal representative seem to be permitted under the statute. At any rate, I do not apply the Massachusetts statute in this case because I conclude that Maine, not Massachusetts, law applies. Although the guardians were appointed in Massachusetts and Winston's real estate is located there, this lawsuit involves a Maine decedent, a personal representative appointed in Maine, and a will probated in Washington County. Maine law, not Massachusetts law, applies here.

27. Siegemund cites *Estate of Tessier,* 468 A.2d 590 (Me.1983). for the proposition that a beneficiary can sue on behalf of the estate under Maine law. I see nothing in the case to that effect. It was based upon objections to an executor's final accounting in the Probate Court.

parties. Shapland is entitled to summary judgment to the extent that the claims are brought on behalf of those two parties.[28]

That leaves one plaintiff: Ralf Siegemund, Special Administrator of the Estate of Joan Siegemund. Ralf Siegemund's standing derives from his late wife, Joan Siegemund. Aside from the emotional distress claims, which are no longer a part of this lawsuit, all of the claims that Siegemund advances are based upon economic loss to the estate. Any damages recovered in this case would therefore be distributed according to the terms of Winston's Will. Shapland argues that Siegemund (now her estate) lacks standing to sue the personal representative because she has no economic interest in the outcome of this lawsuit.

In her Will, Winston devised her personal property and the apartment building located at 133 Commonwealth Avenue in Boston to Joan Siegemund and Diane Crocker, in equal shares. Winston devised the residue of her estate to the Trustee of the Rose Winston 1985 Revocable Trust, which Winston executed and funded on the same day that she drafted her Will. Shapland Aff., Ex. 1. The terms of the Trust direct the trustee, upon Winston's death, to divide equally the Trust assets into two separate Trusts: one for Joan Siegemund and Siegemund's children, and one for Diane Crocker and Crocker's children. *Id.*, Ex. 2. The Trust provides that the trustee has discretionary authority to pay income or principal from the trusts to Siegemund or Crocker during their lifetimes, and that each of the trusts shall terminate "at such time after the death of such daughter as there is no living child of such daughter who is under the age of thirty (30) years." *Id.* The person Winston named to serve as both personal representative and trustee predeceased her. Def.'s SMF ¶ 3; Shapland Aff., Ex. 2. No trustee for the Rose

---

**28.** Siegemund argues that Shapland has waived the capacity defense because he failed to comply with Fed.R.Civ.P. 9(a)'s requirement that a party raise lack of capacity "by specific negative averment" including "supporting particulars." The propriety of Siegemund suing on behalf of the estate is not a new issue to this litigation. Until now, all of the parties have couched the issue in terms of standing, not capacity. Shapland did assert that Siegemund lacked "standing" in his Amended Answer. Now he has filed a motion to amend the answer to add the capacity defense. In his motion to dismiss, Howe argued that Joan Siegemund lacked "standing" to sue on behalf of the estate. Siegemund responded with the same argument she advances now: that Mass. Gen. L. ch. 230 § 5 gives her standing to sue on behalf of the estate. (Docket Item 19, p. 8). At oral argument on November 13, 2002, I asked Siegemund's lawyer to address whether Joan Siegemund had "standing" to sue on behalf of the estate. Siegemund's lawyer responded: "I'm not sure that there isn't a reasonable challenge to that, to the extent that the actions are—pertain to the state of Maine." Oral Argument Tr. at 18. I also referred to the standing/capacity issue in the February 24, 2003 Order, where I noted that I did not have to reach "the defendant Howe's argument that the plaintiff Siegemund has no standing to sue on behalf of the estate." Order at n. 21. Given the foregoing, Siegemund can hardly claim to be surprised or prejudiced by the fact that the issue has been revived in Shapland's motion for summary judgment. Siegemund claims that if Shapland is allowed to raise the capacity defense, she will have to "restructure" her case. Short of being appointed personal representative, however, there is nothing that Siegemund can do to get around the fact that Maine law does not permit her to sue on behalf of or in the name of Winston's estate. Accordingly, I conclude that Shapland has not waived the capacity defense. *See* 5A Wright, & Miller, *Federal Practice and Procedure,* § 1295 ("[A] failure to comply with Rule 9(a) can be ignored in the absence of prejudice, especially when the parties have adverted to a capacity issue."). *See also Gardner v. Parson,* 874 F.2d 131, 139 n. 12 (3d Cir.1989) (failure to deny capacity excused when issue was briefed and there was no prejudice).

Winston 1985 Revocable Trust was appointed after Winston's death. Ralf Siegemund Aff. ¶ 17.[29]

While she was alive, Joan Siegemund was eligible to receive discretionary distributions from the trust. She was, therefore, a permissible beneficiary of the Rose Winston 1985 Revocable Trust, which held the residue of Winston's estate. While she was alive, that gave her an interest in the outcome of this lawsuit because potentially a recovery could benefit her or her estate. Upon her death, however, neither Siegemund nor her estate is any longer eligible to receive distributions. Accordingly, Siegemund's interest in enlarging the 1985 Revocable Trust assets, which would have included any damages recovered in this lawsuit, terminated. Siegemund was greatly aggrieved by what she believes the guardians and Shapland did to her mother and her mother's estate, but, aside from her claims of emotional distress (which are no longer a part of this lawsuit), all of her claims against Shapland are based on economic loss to the Trust through the residuary clause of Winston's Will. With her death, Joan Siegemund no longer qualifies as a beneficiary of the trust and none of her remaining claims relates to her role as a direct devisee of the real estate.[30] Accordingly, neither Joan Siegemund nor Ralf Siegemund, as her Personal Representative, has standing to maintain this lawsuit against the personal representative.

The parties who do have an interest in the outcome of this lawsuit, the real parties in interest, are the remaining Trust beneficiaries: Winston's grandchildren and, if Diane Crocker is still alive, Diane Crocker. Siegemund says in her legal memorandum that the Trust for her "ceased to exist on the death of Joan Siegemund, and the beneficiaries (Joan's children) being over the age of 30." Pls.' Opp'n to Mot. for Summ. J. at n. 13. (Nothing in the record confirms this age assertion.) Regardless of whether the Trust is still in existence, however, Rose Winston's estate plan directed that the residue of her estate, which would include any damages recovered in this lawsuit against the personal representative, pass into the Trust, to be available to her daughters during their lives and to go to her grandchildren on the respective daughter's death. Under Winston's plan,

29. Ralf Siegemund's affidavit says that "on information and belief, no trustee" was appointed. ¶ 17. In his motion to strike certain paragraphs of Ralf Siegemund's affidavit, Shapland says that, although ¶ 17 "is not made on personal knowledge ... it happens to be correct. Defendants have no objection." (Docket item 155).

30. Siegemund did inherit 133 Commonwealth Avenue directly. And, in her Amended Complaint, Siegemund alleges that Shapland should have sued Howe for "permitting an oil leak to continue unabated at 133 Commonwealth Avenue, which eventually required clean-up in an amount in excess of $100,000." I note that it is unclear whether damages recovered on this claim would accrue to Joan Siegemund's estate or to the trust under the terms of Winston's Will. However, I do not have to decide that question.

In his statement of material facts, Shapland says that he did not pursue the oil leak claim against Howe because there was no way to determine when the oil leak began, "so any claim against Howe in this regard would have failed for lack of proof." Def.'s SMF ¶ 27; Shapland Aff., Ex. 16. Siegemund does not respond to this assertion in her response statement of facts. Under Local Rule 56(e), "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." By not responding, Siegemund has admitted that Shapland could not have proved that Howe was responsible for the Commonwealth Avenue oil leak. Shapland therefore cannot be faulted for failing to sue Howe on that theory.

the only people who could benefit from this lawsuit against the personal representative are Winston's grandchildren and, if living, Diane Crocker. Pursuant to Fed.R.Civ.P. 17(a), Siegemund's lawyer has a "reasonable time" to substitute the proper real party or parties in interest. If the real party or parties in interest are not joined or substituted within 45 days, I will grant summary judgment to Shapland on all claims.

### (E) Issue Preclusion

 "A federal diversity court is required to accord all the res judicata effects that a judgment entered in another state would command as a matter of full faith and credit in the courts of any other state." 18B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 4472. *See also Reinke v. Boden*, 45 F.3d 166, 167–68 (7th Cir.1995) ("Since a state court would be required to look to the preclusive effect of the judgment in the state which rendered the judgment, so would a federal diversity court."). The prior decrees that Shapland argues have preclusive effect are all from the Massachusetts' Probate Courts.[31] Accordingly, Massachusetts issue preclusion law applies. In Massachusetts, "[i]ssue preclusion, also referred to as collateral estoppel, prevents relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and ... the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding." *Macomber v. MacQuinn–Tweedie*, 2003 ME 121, ¶ 22, 834 A.2d 131, 138 (internal quotation omit-

ted). Shapland argues that Siegemund is barred from relitigating allegations of the guardians' wrongdoing, because she already litigated, and lost, those issues in the Massachusetts' Probate Courts. However, I have concluded that Siegemund is not the person with standing or capacity to pursue what remains of this case. Shapland does not argue that the Probate Court orders bar the real parties in interest (Winston's grandchildren and, possibly, Diane Crocker) from litigating the guardians' conduct. Although the Probate Court orders may have bound Siegemund, they do not bind the other Trust beneficiaries. Accordingly, issue preclusion does not apply.[32]

### (F) Shapland's Counterclaim; The Release

Shapland has also moved for summary judgment on his counterclaim, seeking attorney fees and costs incurred in defending against Siegemund's claim that he should have sued Nagel. Shapland's counterclaim arises out of an agreement, signed by Joan Siegemund, releasing Shapland of any claims Siegemund might bring against him relating to the care of her mother. In the agreement, Siegemund also agrees to indemnify Shapland for any claims, losses, and expenses he might suffer as a result of any such claims brought by Siegemund.

 The general rule is that "[a] release executed in favor of one standing in a fiduciary relation to one executing the release will be subjected to the closest scrutiny by the court." *E.g., Allen v.*

---

**31.** Shapland does argue that certain Maine decrees preclude Siegemund from relitigating allegations of *Nagel's* wrongdoing. Because I have concluded that Shapland is entitled to summary judgment on the claim that he should have sued Nagel, however, I deal only with the claim that he should have sued

Howe. All the decrees that Shapland argues preclude Siegemund from relitigating allegations of Howe's misconduct are from Massachusetts' probate courts.

**32.** Shapland's argument that claim preclusion applies fails for the same reason.

*Moushegian,* 320 Mass. 746, 71 N.E.2d 393, 400 (1947). A "release is not effective to discharge a fiduciary's liability for breach of the trust imposed in him unless the person executing the release had knowledge of all relevant facts that the fiduciary knew or ought to have known." *Id.* In addition, according to the Restatement (Second) of Trusts, § 217, "[a] release or contract is not effective to discharge the trustee's liability for a breach of trust, if . . . the release or contract of the beneficiary was induced by improper conduct of the trustee."

█ In this case, Siegemund alleges that Shapland's decision not to file lawsuits against the guardians was the result of some agreement between Shapland and others that he would not sue. This allegation alone raises a question regarding the release's enforceability. It is impossible to determine whether the release is effective until the facts surrounding Shapland's decision not to sue are established. Summary judgment on Shapland's counterclaim is therefore **DENIED**.

## IV. CONCLUSION

There is no admissible evidence that a reasonable fiduciary would have filed a lawsuit against Nagel, the guardian of Winston's person. Shapland's motion for summary judgment on Siegemund's claim that the personal representative should have sued Nagel is therefore **GRANTED**. Shapland's motion for summary judgment on Siegemund's intentional and negligent infliction of emotional distress claims and conspiracy claim is GRANTED. Shapland's motion for summary judgment on his Counterclaim is **DENIED**.[33]

Ralf Siegemund does not have standing to sue the personal representative for breach of fiduciary duty to his deceased wife Joan or their children. If the real party or parties in interest are not joined or substituted within forty-five (45) days, Shapland's motion for summary judgment on Siegemund's claim that the personal

---

33. Counts IV, V, VI, and VIII assert claims against Nagel and Howe. Pursuant to my orders dated February 24, 2003, and February 26, 2004, Counts IV, V, VI, and VIII are no longer a part of this lawsuit. Pursuant to this Order, Counts III and VII, stating claims for violations of the Massachusetts Consumer Protection Act and the Maine Unfair Trade Practices Act, and Count IX, the Conspiracy claim, are also gone. Counts I and II each assert claims against Shapland for breach of fiduciary duty and negligence and for negligent and intentional infliction of emotional distress. Summary judgment is granted on the emotional distress and negligence portions of those counts. The breach of fiduciary duty claims under Counts I and II remain. Count X alleges that Shapland breached his fiduciary duty by allowing the statute of limitations to run. Insofar as Count X faults Shapland for letting the statute run on claims against Nagel, it is no longer a part of this lawsuit. Count X is still viable as it relates to the claim against Howe. In sum, portions of Counts I, II and X remain at this point.

This Order disposes of the pending motions as follows: Siegemund's motion to strike Shapland's record citations is **MOOT**. (Docket Item 135). Shapland's motion to strike certain portions and paragraphs of Siegemund's Statement of Material Facts is **DENIED IN PART**, and the remainder of that motion is **MOOT**. (Docket Item 156). Siegemund's motion to exclude portions of the expert testimony of Martha Gaythwaite is **DENIED**. (Docket Item 112). Shapland's motion to exclude all of the testimony of Calvin True is **GRANTED IN PART AND DENIED IN PART**. (Docket Item 114). Shapland's motion to exclude portions of the testimony of John Kline is DENIED. (Docket Item 114). Shapland's motion to exclude portions of the testimony of John Thornton is GRANTED. (Docket Item 114). Shapland's motion to strike certain paragraphs of Ralf Siegemund's affidavits is **DENIED**, and the remainder of that motion is **MOOT**. (Docket Item 155). Finally, Shapland's motion for leave to file a second amended answer is **GRANTED**. (Docket Item 157).

representative should have sued Howe, the guardian of Winston's property, will be GRANTED. Pursuant to Fed.R.Civ.P. 17(a), joining or substituting the real party or parties in interest will "have the same effect as if the action had been commenced in the name of the real party in interest." If Siegemund's lawyer joins the real party or parties in interest, discovery will reopen for sixty (60) days to permit the plaintiff to seek expert testimony on compliance with the willful default standard.

SO ORDERED.